UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                                    Case No.: 22-19451-PDR

FedNat Holding Company, *et al*[1].                       Chapter 11

        Debtors.

_____/

**DECLARATION OF KATIE S. GOODMAN,**
**CHIEF RESTRUCTURING OFFICER OF FEDNAT HOLDING COMPANY,**
**IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

      I, Katie S. Goodman, hereby declare that the following is true and correct to the best of my information, knowledge, and belief:

      1.     I am the Chief Restructuring Officer ("**CRO**") of FedNat Holding Company ("**FNHC**"), which is the parent company of FedNat Underwriters, Inc., ClaimCor, LLC, Century Risk Insurance Services, Inc., and Insure-Link, Inc. (collectively, the "**Debtors**").

      2.     I currently perform my duties out of FNHC's headquarters located at 14050 N.W. 14th Street, Suite 180, Sunrise, Florida.

      3.     I am the Managing Partner of the firm GGG Partners, LLC ("**GGG**"), based in Atlanta, Georgia.  On September 30, 2022, as amended on November 28, 2022, FNHC engaged GGG to provide turnaround management services, and designated me as CRO.

      4.     GGG is a national turnaround consulting firm that provides turnaround, business and advisory and restructuring services over a multitude of industries and markets.  Sample representations of GGG include financial advisory services to a number of debtors, including: *In*

---

[1] The Debtors in these Chapter 11 Cases are FedNat Holding Company; FedNat Underwriters, Inc.; ClaimCor, LLC; Century Risk Insurance Services, Inc.; and Insure-Link, Inc. The Debtors' headquarters are located at 14050 N.W. 14th Street, Suite 180, Sunrise, Florida.

*re Regional Housing & Community Services Corp., et al.* (Bankr. N.D. Ga) (Chief Restructuring Officer); *USA Dry Van Logistics, LLC* (Bankr. S.D. Tex.) (Chief Restructuring Officer); *In re The Cliffs Club & Hospitality Group, Inc., et al. d/b/a The Cliffs Golf and Country Club* (Bankr. D.S.C.) (Chief Restructuring Officer); *In re The Aliera Companies Inc. d/b/a Aliera Healthcare, Inc.* (Bankr. D. Del.) (Chief Liquidating Officer), *In re Trendset, Inc.* (Bankr. D.S.C.) (Chapter 11 Trustee and Plan Administrator); and *In re Phoeben, Inc.* (Bankr. S.D. Tex.) (Sale Process Advisor).

5.      I have more than 20 years of experience in the practice of turnarounds and restructuring.  Among my many engagements, I have acted as receiver, assignee in general assignments for the benefit of creditors, and Chief Restructuring Officer in matters filed under Chapter 11 of the United States Bankruptcy Code.

6.      Before joining GGG, I worked for a leveraged buyout fund, where I focused on assessing and acquiring middle-market companies including acquisitions in the telecommunications, textile and industrial distribution industries.

7.      I was a recipient of the "40 Under 40 M&A Advisor Recognition Awards" for turnaround professionals by the M&A Advisor.  I also received the 2013 Small Company Turnaround of the Year by the Atlanta Chapter of the Turnaround Management Association for my role as the Chief Restructuring Officer of The Cliffs Club & Hospitality Group, Inc.

8.      In my capacity as FNHC's CRO, I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and records.

9.      Specifically, I have been directly involved in the matters leading up to these Chapter 11 filings, including financial planning, forecasting, and the restructuring process.

10.     I am authorized to submit this declaration (this "**Declaration**") on behalf of the Debtors and in connection with (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**") and (b) the relief requested by the Debtor pursuant to the pleadings described herein (collectively, the "**First Day Motions**").[2]

11.     Except as otherwise indicated, all facts and statements set forth in this Declaration are based upon (a) my personal knowledge or opinion, (b) information obtained from members of the Debtors' management team, employees or advisors, (c) the Debtors' books and records maintained in the ordinary course of their business, or (d) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.

12.     I submit this declaration in support of the First Day Motions and pursuant to 28 U.S.C. § 1746.

13.     If called upon to testify, I could and would testify competently to the statements set forth in this Declaration, as the information in this Declaration is accurate to the best of my information, knowledge, and belief. In making the statements herein, I have relied in part upon others to accurately record, prepare and collect necessary documentation and information.

## Preliminary Statement

14.     FNHC is a regional insurance holding company that controls substantially all aspects of the insurance underwriting, distribution and claims processes through subsidiaries and contractual relationships with independent agents and general agents.

---

[2] Terms used but not otherwise defined herein have the meanings assigned to such terms in the relevant First Day Motion.

15.     FNHC, through its wholly owned subsidiaries, are authorized to underwrite, and/or place homeowners multi-peril ("homeowners"), federal flood and other lines of insurance in Florida and other states.

16.     The Debtors are not insurance carriers and do not issue insurance policies. Rather, FNHC provides agency, underwriting and policyholder services to its insurance carrier clients. FNHC's business is comprised of two primary components — underwriting and claims processing. FNHC's customers and revenue sources are mainly insurers, who engage FNHC to underwrite and service homeowners insurance policies that those clients issue. Homeowners insurance policies are typically written on an annual basis. A significant component of the Debtors' business model is therefore dependent on the annual renewal of policies written by its insurance carrier clients, whereupon the Debtors earn commissions and additional revenue for providing services in connection with those policies.

17.     Until late September 2022, FNHC's most significant customer was its wholly-owned subsidiary FedNat Insurance Company ("**FNIC**"), which was an insurance carrier and an "admitted" company and licensed to write homeowners insurance in all or some of the states of Florida, Louisiana, Texas, South Carolina, Alabama, Georgia, and Mississippi.

18.     On or about September 21, 2022, the Florida Office of Insurance Regulation ("**OIR**") notified the Florida Department of Financial Services of OIR's determination that one or more grounds existed for the initiation of receivership proceedings against FNIC. In response to OIR's notification, on September 23, 2022, the Florida Department of Financial Services ("**DFS**") petitioned the Circuit Court of the Second Judicial Circuit in and for Leon County, Florida (the "**State Court**"), for an order appointing DFS as receiver for FNIC, in the action styled *State of Florida ex rel., Dep't of Fin. Servs. v. FedNat Insurance Company,* Case No. 2022-CA-001688

(the "**Receivership Proceedings**"). On September 27, 2022, the State Court in the Receivership Proceedings entered a *Consent Order Appointing the Florida Department of Financial Services as Receiver of FedNat Insurance Company for Purposes of Liquidation, Injunction, and Notice of Automatic Stay* (the "**Receivership Order**"). Following entry of the Receivership Order, DFS took over control of FNIC.

19.     As mandated by the Receivership Order, FNIC's insurance policies were canceled effective as of October 27, 2022 and were rewritten on other insurance companies. The DFS, as receiver for FNIC, will service the "run-off" of the FNIC policies in-house and through contracts with other third-party administrators. These services were previously rendered by FNHC.  As a result, FNHC has experienced a significant loss of revenue, an impairment of its cash flow, and an immediate deterioration in its enterprise value.

20.     Thus, after entry of the Receivership Order, FNHC's principal business consists of its servicing functions for MNIC under the MGA Agreement (as those terms are defined below).

21.     Additionally, the Debtors have been severely impacted by, among other things, an elevated number of severe weather events giving rise to catastrophe losses (particularly losses stemming from FNHC's non-Florida books of business), rate issues, and litigation abuse.

22.     The Debtors intend to continue to operate their businesses during the pendency of these Chapter 11 Cases and anticipate using these Chapter 11 Cases as a means to explore all value maximizing propositions for creditors, including, but not limited to, potential asset sales.  Indeed, the Debtors have begun negotiating with a third party to submit an asset purchase agreement and aim to be in a position to submit bid procedures relating to a sale or sales in short order.

23.     To familiarize the Court with the Debtors and the relief sought in the First Day Motions filed in these Chapter 11 Cases, this Declaration is organized into four (4) parts as follows:

(i) Part I describes the history, business and affairs of the Debtors, their corporate structure and business operations; (ii) Part II provides an overview of the Debtors' capital structure; (iii) Part III provides a description of the circumstances leading to the commencement of these Chapter 11 Cases; and (iv) Part IV provides an overview of the relief requested in the First Day Motions and sets forth the relevant facts in connection therewith.

24.     It is crucial to the success of the Debtors' efforts to maximize the value of their estates and ensure an expeditious resolution of these Chapter 11 Cases that they obtain the requisite authority from this Court to maintain their key constituencies and operate their day-to-day business with minimal disruption and erosion.

## I. GENERAL BACKGROUND

### A. Debtors' Overview and Business Operations

25.     FNHC is a regional insurance holding company that controls substantially all aspects of the insurance underwriting, distribution and claims processes through subsidiaries and contractual relationships with independent agents and general agents.

26.     FNHC, through its wholly owned subsidiaries, are authorized to underwrite, and/or place homeowners multi-peril ("homeowners"), federal flood and other lines of insurance in Florida and other states.

27.     Prior to the Petition Date, FNHC owned three insurance subsidiaries which included: FNIC, Maison Insurance Company ("**MIC**")[3], and Monarch National Insurance Company ("**MNIC**").

---

[3] MIC merged into FNIC on August 11, 2022, with FNIC being the surviving entity.

28.    MNIC is a Florida Property Insurance company licensed to write homeowners property and casualty insurance in Florida.  MNIC is owned 70% by a group of investors managed by Hale Partnership Capital Management LLC and 30% by FNHC (as discussed below in conjunction with the "**Monarch Transaction**").

29.    Through FNHC's wholly-owned subsidiary, FedNat Underwriters, Inc. ("**FNU**"), FNHC serves as managing general agent for MNIC (and prior to entry of the Receivership Order, FNIC).

30.    ClaimCor, LLC ("**ClaimCor**"), a wholly-owned subsidiary, is a claims solutions company that, prior to entry of the Receivership Order, processed claims for FNIC[4].

31.    Century Risk Insurance Services, Inc ("**CRIS**") is a wholly-owned subsidiary that provides services and reinsurance brokerage.  In turn, CRIS wholly owns Insure-Link Inc. ("**IL**"), an insurance agency.

32.    Pursuant to an Amended and Restated Managing General Agency and Claims Administration Agreement  dated March 2, 2018 between FNU and MNIC (and as amended by Addendum Number 1 dated August 21, 2018, Addendum Number 2 dated October 9, 2018, Addendum Number 3 dated December 7, 2020, and by Addendum Number 4 dated July 1, 2022) (collectively, the "**MGA Agreement**") FNU serves as managing general agent with respect to insurance policies for authorized insurance coverages in each state where MNIC is licensed and authorized to transact insurance.  Generally, the MGA Agreement provides that FNU will provide

---

[4] ClaimCor, along with MIC, were purchased by FNHC on December 2, 2019, from 1347 Property Insurance Holdings, Inc. ("**PIH**"). Specifically, FNHC purchased from PIH all of the outstanding equity of MIC and ClaimCor (collectively, the "**Maison Companies**"). The Maison Companies provide multi-peril and wind/hail only coverage to personal residential dwellings and manufactured/mobile homes in Louisiana, Texas and Florida. The acquisition enabled FNHC to increase geographic diversification of its book of business outside of Florida and generate additional business with operating synergies and general and administrative expense savings.  On August 11, 2022, MIC merged into FNIC, with FNIC being the surviving entity.

MNIC policy services (such as receiving and accepting proposals of insurance), policy underwriting, collecting premiums, fees, interest, and service charges, and claims administration services. In return, FNU is entitled to retain up to 4% (but not less than 1%) of MNIC's Total Written Annual Premium (as that term is defined in the MGA Agreement) as a commission for new and renewal business services, and up to 3.6% (but not less than 1%) of MNIC's Total Earned Annual Premium (as that term is defined in the MGA Agreement) for fees applicable to new and renewal business for claim services.

33.     The Debtors' organizational structure (after the Monarch Transaction, discussed below) is as follows:



## II. THE DEBTOR'S CAPITAL STRUCTURE

### A. Secured Debt

34.     The Debtors do not have any secured debt.

### B. Unsecured Debt

35.     On March 5, 2019, FNHC issued $100 million in the aggregate principal amount of Senior Unsecured Notes Due 2029 (the "**Senior Notes**") under an indenture dated as of March 5, 2019, as supplemented on March 5, 2020, and as further supplemented on April 19, 2021 (collectively, the "**Senior Notes Indenture**"), by and among FNHC, as issuer, and The Bank of New York Mellon, as trustee (the "**Senior Notes Trustee**"). Pursuant to the Senior Notes Indenture, the Senior Notes currently bear interest at a rate of 7.75% during Interest Accrual Periods for which a Step-up Event is not in effect, or for each Interest Accrual Period for which a Step-up Event is in effect, 7.75% plus an additional 50 basis points for each notch downgrade below a "BBB-" rating (as those terms are defined in the Senior Notes Indenture), payable semi-annually on March 15 and September 15 of each year.  As of the Petition Date, there was approximately $100 million in principal outstanding under the Senior Notes.

36.     Further, on April 19, 2021, FNHC issued $21 million in the aggregate principal amount of Convertible Senior Unsecured Notes Due 2026 (the "**Convertible Notes**" and collectively with the Senior Notes, the "**FedNat Notes**") under an indenture dated as of April 19, 2021 (the "**Convertible Notes Indenture**"), by and among FNHC, as issuer, and The Bank of New York Mellon, as trustee (the "**Convertible Notes Trustee**" and collectively with the Senior Notes Trustee, the "**Indenture Trustee**"). Pursuant to the Convertible Notes Indenture, the Convertible Notes bear interest at a rate of 5.0% per year, payable semi-annually on April 15 and October 15 of each year, and will mature on April 15, 2026. Subject to certain adjustments, the holders may convert the Convertible Notes into common shares of FNHC's stock.  As of the Petition Date, there was approximately $21 million in principal outstanding under the Convertible Notes.

37. In addition to the FedNat Notes, the Debtors' unsecured debt also stems from a variety of other sources, including (i) accrued and unpaid trade debt incurred in the ordinary course of the Debtors' business and (ii) claims by lease and contract counterparties for unpaid obligations.

38. Claims on account of rejected executory contracts and unexpired leases during these Chapter 11 Cases could cause the amount of unsecured claims to increase.

39. As of the Petition Date, the Debtors have unsecured debt in the combined approximate amount of $171 million.

**C. Equity**

40. As of April 25, 2022, the beneficial ownership of FNHC's common stock was as follows:[5]

| Name and Address of Beneficial Owner (1) | Number of Shares Beneficially Owned | Percent of Class Outstanding (1) |
|---|---|---|
| Michael H. Braun (2) | 610,077 | 3.42 % |
| Bruce F. Simberg (3) | 522,991 | 2.94 % |
| Ronald A. Jordan (4) | 53,311 | * |
| Thomas A. Rogers (5) | 36,058 | * |
| Jenifer G. Kimbrough (6) | 36,045 | * |
| Roberta N. Young (7) | 30,035 | * |
| David W. Michelson (8) | 19,851 | * |
| David K. Patterson (8) | 19,851 | * |
| All directors and executive officers as a group (8 persons) (9) | 1,328,219 | 7.45 % |
| | | |
| **5% or greater holders:** | | |
| Hale Partnership Capital Management, LLC (10)<br>Hale Partnership Capital Advisors, LLC<br>Hale Partnership Fund, L.P.<br>Steven A. Hale II<br>2115 E. 7th Street<br>Charlotte, NC 282204 | 2,008,294 | 11.27 % |
| Lenox Capital Management, Inc. (11)<br>Douglas Ruth<br>322 Alana Drive<br>New Lenox, IL 60451 | 1,315,243 | 7.38 % |

\*        Less than 1%.

---

[5] Pursuant to a Schedule 13D filed by Hale on May 23, 2022, Hale and his entities collectively owned 11.5% of FNHC's stock, a .23% increase from what was reflected on FNHC's books and records as of April 25, 2022.

41.    HPCM and its affiliates[6] are, collectively, currently the largest shareholder of FNHC, and beneficially own in the aggregate 11.5% of the outstanding FNHC common stock (as to which they have filed a disclaimer of control affidavit with the Florida OIR).

42.    FNHC has authorized 50 million shares of common stock, with 17,695,200 shares being issued and outstanding.  As of December 9, 2022, the approximate aggregate value of this outstanding common stock is $176,952.

### III. EVENTS LEADING UP TO THESE CHAPTER 11 CASES

43.    As an industry, the Florida property insurance industry lost over $1.6 billion in 2020 and over $1.5 billion in 2021, driven by catastrophe losses, higher catastrophe reinsurance costs, and an adverse claims environment stemming in large part from litigation abuse and other forms of social inflation of claim costs[7].  Indeed, in 2022 alone, five other Florida insurance companies have been put into receivership by the OIR.

---

[6] Specifically, Hale Partnership Capital Management, LLC, Hale Partnership Capital Advisors, LLC, Hale Partnership Fund, L.P., MGEN II – Hale Fund, L.P., Clark Hale – Fund L.P., Smith II– Hale Fund, L.P., Dickinson – Hale Fund, L.P. and Steven A. Hale II, collectively own approximately 11.5% of the Companies' equity interests as of May 23, 2022.

[7] An example is the frivolous lawsuits plaguing assignment of benefits ("**AOB**") property insurance litigation and the one-way attorney's fees involving these suits.  Under an AOB, a policyholder assigns his or her right to file a claim under a homeowners' policy to a third-party contractor, who begins work to repair property damage as quickly as possible.  The contractor then files a claim against the insurer, who has never had an opportunity to assess the loss or determine if any unnecessary repairs were performed or whether repair costs were inflated.  If the insurer denied the contractor's claim, Florida's one-way attorney's fee statute (which allowed courts to order the insurer to pay attorney's fees if the plaintiff prevailed, but would not allow the insurer to collect attorney's fees in successfully defending against such lawsuits) incentivized aggressive plaintiff's lawyers to file lawsuits against insurers without the risk of having to pay the insurer's legal fees if they did not prevail.

Florida, which accounts for just 9% of property insurance claims, generates 79% of the nation's homeowner lawsuits. This entire scheme has been described as "a blizzard of 'frivolous' lawsuits by shady contractors who wield the threat of attorney fee multipliers after homeowners sign over their benefits."  *See* https://www.floridabar.org/the-florida-bar-news/governor-signs-property-insurance-reforms-and-condo-safety-measures/

44.     The Debtors' financial results for 2021 reflect the impact of an elevated number of severe weather events, including seven named storms that made landfall in the United States. During this period, the Debtors were impacted by notable weather events impacting Florida, Texas, Louisiana, and South Carolina, particularly losses associated with Winter Storm Uri, which caused heavy residential damage in Texas, primarily associated with freezing temperatures causing widespread instances of burst water pipes.  The total impact of 2021 catastrophe losses on the Debtors was over $800 million on a gross basis, which was reduced to $86 million, pre-tax, net of amounts ceded to the Debtors' reinsurance partners and other recoveries including related claims handling revenues.  Over 80% of these net catastrophe losses stemmed from the Debtors' non-Florida books of business, despite those books representing less than 40% of the Debtors' gross written premiums.

45.     Further, during the first quarter of 2022, the Debtors reported a net loss of $31.3 million, with the Debtors' losses and loss adjustment expenses increasing 22.4%.  These net losses were primarily driven by larger net catastrophe losses and lower gross premiums earned.

46.     In April 2022, the Demotech[8] rating of FNIC was downgraded from an "A" rating to an "S" rating, which adversely impacted FNHC's ability to obtain excess-of-loss reinsurance for coverage beginning July 1, 2022 and placed FNIC in non-compliance with the OIR.

47.     In order to recapitalize, on May 23, 2022, FNHC entered into an agreement with HPCM, whereby, among other things, HPCM and its affiliates invested $15 million into MNIC, which caused HPCM to become the majority owner of MNIC (the "**Monarch Transaction**").

---

[8] Demotech, Inc. is an American insurance rating agency headquartered in Columbus, Ohio, that focuses on independent, regional and specialty companies in the Property and Casualty insurance industry.

FNHC also invested $10 million into MNIC for the remainder of MNIC's common stock and retains two seats on MNIC's board of directors.

48.     Pursuant to the Monarch Transaction, MNIC assumed approximately 83,000 policies insuring Florida insureds from FNIC effective June 1, 2022.  FNIC's remaining Florida policies were canceled effective June 29, 2022, with unearned premiums being remitted to policyholders.  Further, FNHC cancelled the remaining policies of MIC effective June 29, 2022.  Policy servicing and claims administration with respect to policies transferred to MNIC continued to be performed by FNU.  Finally, all FNIC business written in states other than Florida (*i.e.*, Alabama, Mississippi, South Carolina, and Texas) was transferred to and assumed by a SageSure Insurance Managers, LLC ("**SageSure**")[9] carrier partner, and with all Louisiana policies being canceled by FNIC effective July 1, 2022, with policyholders receiving an offer of replacement coverage from a SageSure carrier partner effective upon cancellation of the FNIC policy.

49.     Thus, through the Monarch Transaction, FNHC materially exited non-Florida markets[10].   In doing so, the Debtors reduced their exposure to catastrophe losses and earnings volatility and re-focused on Florida operations, where the Debtors' approved rates have increased substantially, and where recent legislative actions have begun to improve the claims litigation environment.

---

[9] FNHC is a party to a managing general underwriting agreement with SageSure to facilitate its FNIC homeowners business outside of Florida. As a percentage of the total homeowners premiums, 11.7% and 24.5% of FNCH's premiums were underwritten by SageSure, for the three months ended March 31, 2022 and 2021, respectively. As part of FNHC's partnership with SageSure, previously FNHC entered into a profit share agreement, whereby FNHC shared 50% of net profits of this line of business through June 30, 2020, as calculated per the terms of the agreement, subject to certain limitations, which included limits on the net losses that SageSure could realize.

[10] FNHC is a party to an insurance agency master agreement with Ivantage Select Agency, Inc. ("**ISA**"), an affiliate of Allstate Insurance Company ("**Allstate**"), pursuant to which FNHC has been authorized by ISA to appoint Allstate agents to offer FNIC homeowners insurance products to consumers in Florida. As a percentage of the total homeowners premiums FNHC underwrote, 17.4% and 19.6% were from Allstate's network of Florida agents, for the three months ended March 31, 2022 and 2021, respectively.

50.       In connection with the closing of the Monarch Transaction, the parties entered into

the following:

- Omnibus Amendment Agreement dated as of June 30, 2022 (the "**Omnibus Amendment**") among MNIC, FNIC, FNHC, and HPCM, which amended certain provisions of the Master Restructure Agreement dated as of May 13, 2022 (the "**Restructure Agreement**") among MNIC, FNIC, FNHC, and HPCM, and the Stock Investment and Subscription Agreement dated as of May 13, 2022 (the "**Subscription Agreement**") among HPCM, FNIC, FNHC, and MNIC. Among other things, the Omnibus Amendment clarified that the expected negotiations with the holders of FNHC's outstanding senior unsecured notes will occur following closing and modified the condition to closing that Demotech reconfirm its rating of MNIC prior to closing.

- Management Agreement effective as of June 1, 2022, between MNIC and HPCM pursuant to which HPCM provides MNIC with management services relating to financial, compliance, investment and cash management, tax and strategic planning matters for a management fee equal to 60 basis points on MNIC's assets.

- HG Managing Agency, LLC ("**HG Managing**") and FNU entered into a Management Advisory Services Agreement dated July 1, 2022 ("**MSA Agreement**") whereby HG Management agreed to identify cost savings and other restructuring steps necessary to achieve positive financial results and to assist in the management of FNU and CRIS, ClaimCor, and SCCC (including managing and overseeing personnel, accounting, and other matters). As consideration for the MSA Agreement, FNU agreed to pay HG Managing 1.5% of gross earned premium per annum of MNIC and, solely with respect to its policies in Texas, MIC.

- Shareholders' Agreement dated and effective as of July 1, 2022, by and among MNIC, HPCM, and FNHC (the "**Shareholders' Agreement**"), which provides for the relative rights and preferences of HPCM and FNHC as shareholders of MNIC following the closing of the Monarch Transaction. The Shareholders' Agreement, among other things: (a) provides for a five-member board of directors, of which three members are designated by HPCM and two members are designated by FNHC, with such designation rights subject to maintaining stated levels of ownership in MNIC, except that the initial FNHC designees, Dave Michelson and Jenifer Kimbrough, shall be MNIC directors for two years following the closing notwithstanding any subsequent change in FNHC's ownership of MNIC shares; and (b) provides for customary restrictions on transfer of the MNIC shares, with a drag-along right in favor of HPCM and a tag-along right in favor of FNHC.

- FNIC and MNIC entered into binding term sheets for the acquisition by MNIC following the closing of (a) FNIC's National Flood Insurance Program (the "**Flood Book**") for an agreed price, subject to a 45-day "go shop" right; and (b) FNIC's commercial general liability ("**CGL**") insurance policies, which are currently in run off, pursuant to which MNIC will assume 100% of all net retained losses for the CGL book. FNU will retain responsibility for claims administration for the CGL book following the closing.

- FNHC and HPCM (and its affiliates) entered into a binding term sheet pursuant to which, for the 90-day period following the closing, if FNHC's non-statutory cash is below an agreed level, FNHC may sell to HPCM, and HPCM may purchase from FNHC, 30,000 of the shares of MNIC common stock held by FNHC for a purchase price of $2.5 million.

- The parties also entered into an amendment to the existing managing general agency agreement between FNU and MNIC and a new cost sharing agreement to replace the existing cost sharing agreement between FNU and MNIC, both to clarify the costs payable separately by MNIC and included in FNU's managing general agent fee following the closing.

51.     On September 8, 2022, FNHC and HPCM entered into a Stock Purchase Agreement (the "**Stock Purchase Agreement**") and closed the sale of 30,000 shares of the common stock of MNIC held by FNHC to HPCM and its affiliates for $2.5 million. As a result of this transaction, HPCM and its affiliates increased their ownership of MNIC's outstanding common stock to 70% and FNHC reduced its ownership of MNIC's common stock to 30%.

52.     As discussed above, on September 27, 2022, the State Court in the Receivership Proceedings entered the Receivership Order. Following entry of the Receivership Order, DFS took over control of FNIC.

53.     As mandated by the Receivership Order, FNIC's insurance policies were canceled on October 27, 2022 and were rewritten on other insurance companies. The DFS, as receiver for FNIC, will service the "run-off" of the FNIC policies in-house and through contracts with other third-party administrators. These services were previously rendered by FNHC.

54.     Thus, after the entry of the Receivership Order, FNHC's primary business consisted of its servicing functions for MNIC under the MGA Agreement.  As a result, FNHC has experienced a significant loss of revenue, an impairment of its cash flow, and an immediate deterioration in its enterprise value.

55.     Moreover, in addition to the problems emanating from FNIC's demise, FNHC is in default under the terms of the Senior Notes Indenture and Convertible Notes Indenture.  Prior to the Petition Date, the Debtors advisors engaged in a number of discussions regarding a potential chapter 11 filing and value maximizing paths forward with counsel for the Indenture Trustee, counsel for an *ad hoc* committee of the FedNat Notes (such committee comprising approximately 90% of the FedNat Notes), and held an informational call open to all holders of the FedNat Notes on November 10, 2022, to discuss the same issues and answer questions from such noteholders.

56.     Finally, on September 23, 2022, MNIC emailed[11] FNHC and FNU a Notice of Default and Violation; Demand for Payment; Reservations of Rights letter (the "**MNIC Default Notice**").  In the MNIC Default Notice, MNIC alleged that FNHC and FNU: (i) were in breach of various provisions of the MGA Agreement; and (ii) that FNIC, FNU and FNHC owe approximately $4.1 million to MNIC for various items allegedly required to be paid to MNIC under various provisions of the MGA Agreement.  The Debtors dispute the MNIC Default Notice and further contend that MNIC is indebted to them in the approximate amount of $2.6 million after amounts between the companies were setoff.

57.     Subsequently, however, on October 31, 2022, FNHC and FNU received from MNIC a notice of termination as to the MGA Agreement effective January 1, 2022.

### IV. OVERVIEW OF FIRST DAY MOTIONS AND APPLICATIONS

58.     In order to ensure a smooth transition of the Debtors' business operations into Chapter 11, the Debtors have requested various types of relief in the First Day Motions filed

---

[11] The Debtors contend that pursuant to the MGA Agreement, the MNIC Default Notice did not provide proper notice to the Debtors, and is thus an ineffective notice.  However, on October 13, 2022, counsel for MNIC confirmed that the MNIC Default Notice was not an actual notice of termination under Article 8 of the MGA Agreement and that MNIC did not intend that the MGA Agreement would be terminated within 30 days of the MNIC Default Notice.

concurrently with this Declaration. A summary of the relief sought in each First Day Motion, as well as the factual basis for each First Day Motion, is set forth below.

59.     I have reviewed each of these First Day Motions (including the exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the type of relief sought in each of the First Day Motions: (i) is necessary to enable the Debtors to operate in Chapter 11 with minimal disruption to its anticipated trajectory in these Chapter 11 Cases; and (ii) is in the best interests of the Debtors and their stakeholders.

### A. *DEBTORS' EX PARTE MOTION FOR JOINT ADMINISTRATION* (the "Joint Administration Motion")

60.     Pursuant to the Joint Administration Motion, the Debtors request that the Court authorize the joint administration of these Chapter 11 Cases for procedural purposes only.  The Debtors are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code, operate as an integrated business with common ownership and control, and share a number of financial and operational systems.  As a result, many of the motions, hearings and orders that will arise in these cases will affect all of the Debtors.

61.     Joint administration in these Chapter 11 Cases will obviate the need for duplicative notices, motions, applications, hearings and orders, and will therefore save considerable time and expense for the Debtors and their estates.

62.     The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration because the Debtors only seek administrative, not substantive, consolidation of the Debtors' estates. As such, the Debtors will continue as separate and distinct legal entities and will continue to maintain their books and records in the ordinary course. Moreover, each creditor may still file its proof of claim against a particular estate.

17

63.     The Court will also be relieved of the burden of scheduling duplicative hearings, entering duplicative orders, and maintaining redundant files and supervision of the administrative aspects of these Chapter 11 Cases by the Office of the United States Trustee will be simplified.

64.     Accordingly, the Debtors believe, and I agree, that it is in the best interest of the Debtors, their estates, their creditors, and other parties-in-interest in these Chapter 11 Cases that the Court grant the relief requested in the Joint Administration Motion.

**B.   *DEBTORS' EX PARTE MOTION FOR AUTHORIZATION TO (I) FILE A CONSOLIDATED CHAPTER 11 CASE MANAGEMENT SUMMARY, (II) FILE A CONSOLIDATED LIST OF CREDITORS, (III) FILE A CONSOLIDATED LIST OF TOP THIRTY CREDITORS, AND (IV) WAIVE THE REQUIREMENT TO FILE A LIST OF EQUITY SECURITY HOLDERS OF FEDNAT HOLDING COMPANY AND MODIFY NOTICE THERETO* (the "Consolidation Motion")**

65.     Pursuant to the Consolidation Motion, the Debtors request that the Court authorize the Debtors to file a consolidated Chapter 11 Case Management Summary, a consolidated list of creditors, and a consolidated list of top thirty creditors.

66.     The Debtors request authority to file a consolidated Case Management Summary, as the filing of a separate Case Management Summary for each of the Debtors would be burdensome. In addition, much of the information contained in the Case Management Summary would be duplicative, and the filing of a consolidated Case Management Summary is more efficient and will provide the Court and parties-in-interest with a more accurate financial picture of the Debtors.

67.     The Debtors have identified approximately 1,500 entities to which notice of certain proceedings in the Chapter 11 Cases must be provided. The Debtors anticipate that such notices will comprise, without limitation, notice of: (i) the filing of the Debtors' voluntary petitions under chapter 11 of the Bankruptcy Code, (ii) the initial meeting of the Debtors' creditors in accordance with section 341 of the Bankruptcy Code, (iii) applicable bar dates for the filing of claims, (iv) the

hearing on adequacy of a disclosure statement in respect of a plan of reorganization or liquidation; and (v) the hearing to confirm a plan of reorganization or liquidation.

68.     The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the Notices and other documents in the Chapter 11 Cases.  The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the Notices and other similar documents, as contemplated by Local Rules 1007-1(A) and 1007-2(A). Thus, the Debtors seek authority to file the lists on a consolidated basis, identifying their creditors and equity security holders in the format or formats currently maintained in the ordinary course of the Debtors' businesses.

69.     Pursuant to Bankruptcy Rule 1007(d), a chapter 11 debtor must file with its voluntary petition a list setting forth the holders of the debtor's twenty largest unsecured claims. This list is primarily used by the United States Trustee for the Southern District of Florida to evaluate the types and amounts of unsecured claims against the debtor and thus identify potential candidates to serve on an official committee of unsecured creditors appointed in the debtor's case pursuant to section 1102 of the Bankruptcy Code.

70.     The Debtors request that a single consolidated list of their combined thirty largest unsecured creditors in the Chapter 11 Cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors. Thus, the Debtors seek authority to file a single consolidated list of their thirty largest unsecured creditors in these cases.

71.     The Debtors also request that the requirements regarding the noticing of equity security holders of FedNat Holding Company stock be modified.  FedNat Holding Company is a

publicly traded company with approximately 75 record holders and 17,695,200 outstanding shares of common stock as of December 7, 2022. FedNat Holding Company does not maintain a list of its equity security holders and therefore must obtain the names and addresses of its shareholders from a securities agent. Preparing and submitting such a list with last known addresses for each such equity security holder and providing the Notice of Commencement to all such parties will be expensive and time consuming and will serve little or no beneficial purpose.

72.     Moreover, because the Debtors are filing with their petitions (and will serve the notice of the commencement of these Chapter 11 cases on) a list of known holders of 5% or more of their outstanding respective equity interests, the Chapter 11 Cases are subject to reporting requirements with the Securities and Exchange Commission (the "**SEC**") and the financial press, and the Chapter 11 Cases will be publicly available on the website established by the Debtors' proposed Claims Agent, Stretto, Inc.,  FedNat Holding Company's stockholders will be aware of the Chapter 11 Cases and their statuses.

73.     Accordingly, the Debtors believe, and I agree, that it is in the best interest of the Debtors, their estates, their creditors, and other parties-in-interest in these Chapter 11 Cases that the Court grant the relief requested in the Consolidation Motion.

## C. *DEBTORS' EMERGENCY MOTION FOR APPROVAL OF FORM OF NOTICE OF COMMENCEMENT AND PROOF OF CLAIM* (the "Case Commencement Motion")

74.     I am advised that because the Debtors have filed an application to retain Stretto, Inc. as the Debtors' noticing, claims and balloting agent, the Debtors are required to file the Case Commencement Motion requesting approval of (i) the form of the commencement of the Chapter 11 Cases, (ii) bar dates for filing proofs of claim, (iii) the form of proof of claim, (iv) the procedures for filing proofs of claim, and (v) approval of the publication notice of the Chapter 11 Cases and bar dates.

75.    I am advised that the Debtors will work closely with the Clerk of the Court with respect to developing and finalizing the form of the notice of the commencement of the Chapter 11 Cases and the form of proof of claim.  The Debtors believe that the cooperative and efficient approach between and among Stretto, Inc., the Debtors, and the Clerk of the Court has conserved the Debtors' limited resources and will also benefit the creditors of the Debtors by establishing clear guidelines with respect to the noticing of the commencement of the cases and the preparation and filing of proofs of claim.

76.    Accordingly, the Debtors believe, and I agree, that it is in the best interest of the Debtors, their estates, their creditors, and other parties-in-interest in these Chapter 11 Cases that the Court grant the relief requested in the Case Commencement Motion.

### D. *DEBTORS' APPLICATION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) EMPLOY AND RETAIN GGG PARTNERS, LLC TO PROVIDE A CHIEF RESTRUCTURING OFFICER, ADDITIONAL PERSONNEL, AND FINANCIAL ADVISORY AND RESTRUCTURING RELATED SERVICES, (B) DESIGNATING KATIE S. GOODMAN AS CHIEF RESTRUCTURING OFFICER FOR THE DEBTORS, EFFECTIVE AS OF THE PETITION DATE AND (II) GRANTING RELATED RELIEF* (the "__GGG Retention Application__")

77.    Pursuant to the GGG Retention Application, the Debtors seek authority to retain GGG on an interim basis, effective as of the Petition Date, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code to provide my services as CRO as well as the services of additional GGG personnel to assist me in the discharge of my duties to the Debtors, as set forth in the engagement letter attached as Exhibit A to the GGG Retention Application.

78.    On September 30, 2022, and as amended on November 28, 2022, in recognition of its need for sound restructuring advice and crisis management services, the Debtors, among other things, sought to retain a firm and a CRO with substantial experience in the reorganization and restructuring of companies in financial distress.  GGG is an experienced financial advisory and

turnaround consultant firm and it and its principals have represented debtors and trustees in numerous bankruptcy cases. I have significant experience in providing advisory services to companies undergoing a financial restructuring, including in chapter 11 bankruptcy cases.

79. As a result of GGG's and my expertise and successful history of providing restructuring management and advisory services to other companies in financially complex, troubled situations similar to the Debtors' situation, the Debtors selected GGG to provide services to it pursuant to the terms of the Engagement Letter. I am needed to direct the affairs of the Debtors through the pendency of these Chapter 11 Cases.

80. I have been retained upon the express approval of the Debtors' Board of Directors, whose members are completely independent of GGG and are performing their duties and obligations as required under applicable law. I have acted and will act under the direction, control and guidance of the Board and shall serve at the Board's pleasure.

81. In that capacity, GGG and I have reviewed the financial and operating performance of the Debtors, reviewed and helped manage the Debtors' operating budgets and liquidity, and advised the Debtors in regard to their restructuring initiatives. The continued post-petition retention of GGG is in the best interests of the Debtors and will enhance their ability to (a) operate and meet their administrative obligations in these cases, and (b) preserve and maximize the value of their assets.

82. Due to GGG's extensive experience in restructuring matters, and in light of the prepetition work done for the Debtors by GGG, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of GGG effective as of the Petition Date.

83.     Except to the extent in my declaration in support of the GGG Retention Application, neither GGG nor I have any connection with the Debtors' creditors or other parties in interest or their respective attorneys.

84.     Accordingly, the Debtors believe, and I agree, that it is in the best interest of the Debtors, their estates, their creditors, and other parties-in-interest in these Chapter 11 Cases that the Court grant the relief requested in the GGG Retention Application.

**E.** ***DEBTORS' EMERGENCY APPLICATION FOR ENTRY OF ORDER AUTHORIZING DEBTORS TO EMPLOY AND RETAIN STRETTO, INC., AS NOTICE, CLAIMS AND SOLICITATION AGENT, EFFECTIVE AS OF THE PETITION DATE*** **(the "<u>Notice, Claims and Solicitation Agent Motion</u>")**

85.     Pursuant to the Notice, Claims, and Solicitation Agent Motion, the Debtors seek approval of its agreement with Stretto and appointment of Stretto as notice, claims, and solicitation agent of the Court.

86.     I am advised that Stretto has substantial experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases. I am further advised that Stretto has substantial experience in cases of this size and complexity, and has acted as the official notice, claims, and balloting agent in many large bankruptcy cases pending in this and other districts nationwide as set forth in the Stretto Retention Application. The approval of the Debtors' agreement with Stretto and Stretto's appointment as the Claims and Noticing Agent will facilitate the orderly and efficient management of the Chapter 11 Cases.

87.     I understand that, except to the extent disclosed in the *Declaration of Sheryl Betance in Support of the Debtors Emergency Application for Entry of Order Authorizing Debtors to Employ and Retain Stretto, Inc., as Notice, Claims and Solicitation Agent, Effective as of the Petition Date*, affirmed by Sheryl Betance and attached to the Stretto Retention Application as

**Exhibit B**, neither Ms. Betance nor Stretto has any connection with the Debtors' creditors or other parties in interest or their respective attorneys.

88.      I am advised that given the number of creditors and notice parties involved in these Chapter 11 Cases, retention of Stretto is required. Stretto has substantial experience and has been authorized to serve as Claims Noticing Agent in other cases in this District.

89.      Accordingly, the Debtors believe, and I agree, that it is in the best interest of the Debtors, their estates, their creditors, and other parties-in-interest in these Chapter 11 Cases that the Court grant the relief requested in the Notice, Claims and Solicitation Agent Motion.

**F.** ***DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS TO PAY (I) ALL PREPETITION EMPLOYEE OBLIGATIONS, (II) PREPETITION WITHHOLDING OBLIGATIONS, AND (III) POST-PETITION EMPLOYEE OBLIGATIONS IN THE ORDINARY COURSE, AND (B) AUTHORIZING BANKS TO HONOR RELATED TRANSFERS* (the "Employee Wage Motion")**

90.      Pursuant to the Employee Wage Motion, the Debtors request interim and final orders to pay and honor, as the case may be, (i) all prepetition claims of Employees, including, but not limited to, claims for Wages, Commissions, PTO, as applicable, and certain costs and disbursements related to the foregoing, (ii) any claims or payments pursuant to the Employee Benefit Plans, (iii) all Benefits Withholding Obligations, (iv) the Business Expenses, and (v) any prepetition claims for Independent Service Providers.  Payments of prepetition amounts owed on account of Employee Obligations and to Independent Service Providers will be subject to the statutory caps contained in section 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

91.      Also pursuant to the Employee Wage Motion, the Debtors seek an order authorizing all banks and other financial institutions to receive, process, honor and pay any and all checks or wire transfers drawn on the Debtors' accounts with respect to payments described in the Employee Wage Motion, and that the Court authorize the Debtors to issue new post-petition checks to replace

any checks that may be dishonored and to reimburse any expenses that Employees may incur as a result of any bank's failure to honor a prepetition check.

92.     The Debtors' Employees primarily operate out of Florida, but the Debtors have Employees located in Alabama, Colorado, Florida, Georgia, Maine, Michigan, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Tennessee, and Texas.

93.     In the weeks leading up to the Petition Date, the Debtors implemented two workforce reductions, whereby the Debtors reduced their workforce by 50 employees.

94.     As of the Petition Date, the Debtors' collective workforce is comprised of approximately 130 employees.  Of the current employees, approximately 84 are full-time salaried employees and approximately 46 are full-time hourly employees.  The Debtors, and in particular, Debtor ClaimCor, LLC, also utilize the services of independent contractors to fulfill critical employment needs and to address fluctuations in demand or provide special skills required by the Debtors.  The number of temporary employees fluctuates at any given time depending upon the Debtors' needs.

95.     **Wages**.  As of the Petition Date, the Debtors' Employees earned Wages or salary on account of their services to the Debtors.  Wages are paid on a bi-weekly basis.  Salaried and Hourly employees are paid bi-weekly on account of service for the two weeks preceding the date that their Wages are paid.

96.     After giving effect to the workforce reduction, the Debtors' gross payroll for the period ending December 2, 2022 is approximately $498,337.93 per payroll period, excluding the Debtors' portion of the Payroll Taxes.  However, post-petition, the Debtors estimate that gross payroll will be approximately $407,447.16, as 25 employees laid off on November 3, 2022 are included in the payroll for the period ending December 2, 2022, but will not be included post-

petition.  As of the Petition Date, the Debtors estimate that they owe Employees an aggregate of approximately $503,175.56 in accrued Wages earned prior to the Petition Date, and that no Employees are owed in excess of the statutory cap under section 507(a)(4) and 507(a)(5) of the Bankruptcy Code on account of such Wages.

97.     The Debtors request the authority, in the ordinary course of business, to pay Wages accrued prepetition to their Employees, up to the statutory priority amount of $15,150 per Employee (inclusive of other Employee Obligations that are subject to section 507(a)(4) of the Bankruptcy Code), and to continue to otherwise pay Employees in the ordinary course of business.

98.     **Payroll Obligations**.  As employers, the Debtors are required by law to withhold Employee Taxes to federal, state and local taxes from Wages for remittance to appropriate tax authorities.  In addition to the Employee Taxes, the Debtors are required to pay, from their own funds, Payroll Taxes, such as social security and Medicare taxes and pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts for state and federal unemployment insurance and remit the same to the Taxing Authorities.

99.     In the aggregate, the Debtors estimate that Payroll Taxes total approximately $67,422 per month, based on actual monthly Payroll Taxes paid during calendar year 2022 and a declining workforce.  As of the Petition Date, the Debtors estimate that there are no unpaid, outstanding amounts owed to the Taxing Authorities on account of Payroll Taxes for the most recent period up to the Petition Date.

100.     The Debtors request authority to continue remitting the Payroll Taxes to the appropriate Taxing Authorities as needed, including, without limitation, with respect to the most recent payroll period up to the Petition Date, and any prior period.

101.    **Costs Incidental to Payroll**.  The Debtors incur Processing Costs incidental to Employee Wages and Commissions, such as payments to parties for charges associated with the administration of the Wages and for other costs incident to the provision thereof.  The Debtors process payroll for all Employees through UKG, the Debtors' payroll third-party administrator.

102.    The Processing Costs owing to UKG are approximately $25,000 per payroll quarter, which is based on a subscription model whereby UKG charges on a per employee, per month basis.  UKG asserts that the Debtors owe Processing Costs of $150,000, and the Debtors have requested verification of such costs.  To the extent such amount is owing, the Debtors seek authority to pay any such amounts that exist.  Payment of the unpaid Processing Costs to UKG and any other parties is justified because the failure to pay any such amounts might disrupt the services of third-party providers that are essential to the timely payment of Employees.  By paying these Processing Costs, the Debtors will avoid disruptions of such services, ensuring that the Employees obtain all of their compensation without interruption.

103.    The Debtors request authority, but not direction, to continue remitting the Processing Costs to the appropriate third parties.

104.    **Vacation Time and Sick/Personal Days**.  The Debtors provide eligible Employees with PTO each year to use for any reason, such as for vacation, personal time, observance of religious holidays, personal illness, personal injury or the illness or injury of dependents or family members.

105.    PTO earned in a given calendar year generally must be used during that calendar year; however, 40 hours of PTO may be carried over to the following calendar year.  The Debtors pay for accrued, but unused, PTO in connection with employee departures, up to a maximum of 40 hours if an employee resigns and works a two-week notice.

27

106.      Accrued PTO is not a current cash payment obligation, as Employees are not entitled to cash payment for accrued and unused PTO, except upon separation and if required by applicable law or specific agreement.

107.      In addition, the Debtors offer one paid day off for the purpose of community betterment and offer paid holidays, bereavement pay to full-time Employees, and jury duty pay.

108.      The Debtors request authority to continue to honor their PTO policies in the ordinary course of business and to honor all prepetition obligations up to the statutory cap related thereto in a manner consistent with their prepetition practices, provided, however, that the Debtors do not seek authority to cash out unpaid PTO upon an Employee's departure unless applicable state law requires such payment.

109.      **Employee Benefit Plans.**  The Debtors have established certain Employee Benefit Plans for eligible Employees that provide, among other benefits, medical, prescription drug, dental and vision plans, life insurance, disability insurance, retirement plans and other benefits which are described in more detail below.

110.      *Medical/Dental/Vision Plans.*  Historically, the Debtors have offered Employees comprehensive Self-Insured Medical Plans through a combination of HDHP, OAPIN, and OAP plans provided by Cigna, as well as subsidized certain benefits to certain former Employees, including (without limitation) benefits provided under COBRA.

111.      Employees are also offered Self-Insured Vision and Dental Plans, which together with the Self-Insured Medical Plans make up the Debtors' Health Plans.

112.      The Health Plans are hybrid plans and require the Debtors to pay a per employee premium and in addition to premium billing to pay a per employee cost that is put into a claims funding account to offset the cost of filed claims. In additional the Debtors pay for associated

administrative costs.  Participating Employees pay monthly premiums, which the Debtors deduct from the participating Employees' paychecks.  Claims are normally paid one or two months in arrears.  The Debtors also pay a monthly network access fee to Cigna on the first day of each month.  The network access fee has averaged approximately $45,741 per month over the past three months.

113.    Nearly all of the Debtors' full-time Employees participate in the Health Plans.  Year to date up through the Petition Date, the Debtors have incurred approximately $674,019 in connection with the Health Plans.  As of the Petition Date, the Debtors estimate that there are approximately $28,768 in accrued and unpaid costs with respect to the Health Plans.  The Debtors anticipate that there are currently, and will be in the future, prepetition claims under the Self-Insured Health Plans that are not yet known to the Debtors.

114.    The Debtors request authority to (a) pay all such amounts owed under the Health Plans to the extent that they remain unpaid on the Petition Date subject to the statutory caps contained in section 507(a)(4) and 507(a)(5) of the Bankruptcy Code (as applicable), (b) continue to provide the Health Plans in the ordinary course of business, and (c) continue to honor the Debtors' obligations under such benefit programs, including any premiums and administrative fees.

115.    *Health Savings Accounts.*  The Debtors offer Employees the option to set up Health Savings Accounts through Cigna.  The annual cost to the Debtors associated with the Health Savings Accounts for 2022 are approximately $1,000.  As of the Petition Date, the Debtors estimate that there are no accrued and unpaid costs associated with the Health Savings Accounts.

116.    The Debtors seek authority to pay any such amounts and to continue their prepetition practices with respect to the Health Savings Accounts.

117.    *Other Insurance Plans.*  The Debtors offer Disability Insurance Plans, including employer-paid short-term disability insurance and voluntary long-term disability insurance.  The employer-paid short-term disability insurance covers up to 60% of an employee's weekly salary up to $1,000 for a period of no more than 11 weeks.  The voluntary long-term disability covers 60% of an employee's monthly salary up to $6,000 until the later of the Employee reaching 65 years of age or the Social Security Normal Retirement Age.  The Disability Insurance Plans are provided by Mutual of Omaha.

118.    The Debtors also offer Employees with a Life Insurance Plan, including providing Employees with $10,000 of basic life and accidental death and dismemberment insurance and additional voluntary life and accidental death and dismemberment insurance that can be purchased by Employees in a maximum amount of $300,000.  The Life Insurance Plan is provided by Mutual of Omaha.

119.    On average, the Debtors incur an aggregate monthly cost of approximately $3,538 in connection with the Disability Insurance Plan and approximately $346 in connection with the Life Insurance Plan.  As of the Petition Date, the Debtors believe that there are approximately $173 in accrued and unpaid monthly costs in connection with the Life Insurance Plan.  Furthermore, as of the Petition Date approximately $1,769 is outstanding with respect to the Disability Insurance Plans.

120.    The Debtors request authority to pay, in their sole discretion, any and all prepetition amounts owed on account of the Disability Insurance Plans and Life Insurance Plans, and to continue their prepetition practices with respect to such benefits.

121.    *Supplemental Insurance Programs.*  The Debtors' Employees may also choose to enroll in certain other Supplemental Insurance Programs, such as group accident, group critical

illness insurance, medical transportation coverage, identity theft protection, prepaid legal services, and pet insurance. The premiums for the Supplemental Insurance Programs are paid for by each participating Employee and are offered through various third-party providers.

122.     The Debtors request authority to continue their prepetition practices with respect to the Supplemental Insurance Programs.

123.     *401(k) Plan.* The Debtors maintain a 401(k) Plan for the benefit of eligible Employees in accordance with the requirements of section 401(k) of the Internal Revenue Code. The 401(k) Plan is administered by Empower Retirement, LLC. The majority of Employees participate and contribute to the 401(k) Plan. Employees may contribute to the 401(k) Plan each year through salary deferrals up to the IRS limit. The Debtors also provide matching contributions up to 6% of the Employees' salary and remit those to Empower together with the amounts contributed by Employees through payroll withholdings. The Debtors' matching contributions fully vest at the end of the first year of service. Pre-petition, the Debtors made approximately $1.41 million annually in company matching contributions on account of the 401(k) Plan, although the Debtor anticipate such contributions to be reduced by approximately 50% post-petition due to the Debtors' workforce reductions. No amounts are accrued but unpaid by the Debtors under the 401(k) Plan as of the Petition Date.

124.     The Debtors request authority, in their discretion, to continue to honor their obligations with respect to the 401(k) Plan, including the matching contributions, in the ordinary course of their business.

125.     **Reimbursable Business Expenses**. Business Expenses incurred by Employees in the course of employment and in furtherance of the Debtors' business are generally paid directly by the Employee and then charged to the Debtors in accordance with the Debtors' reimbursement

policy.  The Debtors reimburse Employees for certain ordinary course expenses incurred within the scope of the Employees' employment, including travel, lodging, transportation, meals and other miscellaneous expenses.

126.     As of the Petition Date, the Debtors are aware of approximately $100,000 in accrued and unpaid Business Expenses awaiting payment.  Most of such unpaid Business Expenses (especially such expenses related to claims processing) are reimbursed by the Debtors' customers. However, to the extent Business Expenses are not reimbursed by customers, while the Debtors encouraged the submission of expense reports for Business Expenses prior to the Petition Date, the Debtors anticipate that some Employees will have not yet submitted their recent expense reports for accrued and unpaid Business Expenses.

127.     The Debtors request authority, in their sole discretion, to (i) continue their prepetition practices with respect to the Reimbursable Expenses in the ordinary course of business, (ii) continue to pay the Reimbursable Expenses as they deem appropriate in their business judgment, and (iii) pay all prepetition amounts outstanding in connection with the Reimbursable Expenses.

128.     **<u>Benefits Withholding Obligations</u>**.  The Debtors seek authorization to pay the Payroll Taxes and all Benefits Withholding Obligations, such as contributions to savings, retirement or pension plans, insurance contributions and charitable contributions, if any.

129.     The Debtors routinely withhold from Employee paychecks the Benefits Withholding Obligations and are required to transmit these amounts to third parties.  The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute moneys held in trust and therefore, are not property of the Debtors' estates.  Thus, whether such funds are prepetition amounts, the Debtors believe that directing such funds to the

appropriate parties does not require Court approval. Nevertheless, in the interests of transparency and full disclosure, the Debtors seek authority to pay any outstanding amounts owed for Benefits Withholding Obligations, in the ordinary course of business, including those incurred prior to the Petition Date.

130.     **Independent Service Providers**.  In addition to the Employees, the Debtors contract with approximately 118 independent contractor desk adjusters who serve as Independent Service Providers providing the Independent Services.

131.     When the Independent Service Providers perform the Independent Services, they generate a bill to ClaimCor, LLC.  ClaimCor, LLC pays the Independent Service Providers' bill, and in turn, passes this cost to MNIC, plus a markup.  Thus, for each bill paid by the Debtors for the Independent Services, ClaimCor, LLC receives significant revenue, which is essential to ClaimCor, LLC's ongoing business operations.

132.     The Debtors pay the Independent Service Providers fixed payments every two weeks through their accounts payable (and not through the Debtors' payroll).

133.     The Independent Service Providers rely on the Debtors for their individual income.

134.     The Debtors estimate that the aggregate accrued amount owing to the Independent Service Providers as of the Petition Date is approximately $478,000, which is largely driven by Independent Services related to Hurricane Ian claims.  The Debtors do not believe that any Independent Service Provider is owed more than $15,150 with respect to pre-petition obligations.

135.      If the Debtors are unable to pay the Independent Service Providers, the Debtors will lose the services of the Independent Service Providers, and the Debtors' business operations will be severely and irreparably compromised.

136.    The Debtors request the authority, in the ordinary course of business, to pay Independent Service Providers for obligations accrued prepetition, up to the statutory priority amount of $15,150 per Independent Service Provider, and to continue to otherwise pay Independent Service Providers in the ordinary course of business.

137.    Accordingly, the Debtors believe, and I agree, that it is in the best interest of the Debtors, their estates, their creditors, and other parties-in-interest in these Chapter 11 Cases that the Court grant the relief requested in the Employee Wage Motion.

G. ***DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO CONTINUE TO (I) MAINTAIN THEIR CASH MANAGEMENT SYSTEM, (II) HONOR CERTAIN PREPETITION AND POST-PETITION OBLIGATIONS RELATED THERETO, (III) USE EXISTING BUSINESS FORMS, AND (IV) PERFORM INTERCOMPANY TRANSACTIONS, AND (B) GRANTING RELATED RELIEF*** (the "__Cash Management Motion__")

138.    Pursuant to the Cash Management Motion, the Debtors request interim and final orders (a) authorizing, but not directing, the Debtors' continued use of (i) their current Cash Management System; and (ii) their existing Bank Accounts and existing Business Forms, including authorizing the Debtors to open and close bank accounts; (b) approving the continuation of Intercompany Transactions; (c) according administrative expense status to ordinary course post-petition Intercompany Transactions; and (d) authorizing the Bank participating in the Cash Management System to honor certain transfers and charge bank fees and certain other amounts.

139.    The Debtors' ability to continue their Cash Management System is essential to their ability to maintain their current operations as they transition into chapter 11.  Absent the ability to maintain their Cash Management System, the Debtors would have to significantly alter their business operations to comply with the U.S. Trustee Guidelines.  In light of the timeline and objectives of these Chapter 11 Cases, as well as the administrative burden the commencement of these Chapter 11 Cases has already placed on the Debtors' employees and management,

compliance with the UST Guidelines would impose a substantial burden on the Debtors' estates. Moreover, the Cash Management System provides benefits to the Debtors, such as enabling them to: (a) control and monitor corporate funds; (b) ensure cash availability; and (c) reduce costs and administrative expenses by facilitating the movement of funds. These benefits are critical give the volume of transactions managed through the Cash Management System.

140.     All of the Debtors' Bank Accounts managed through the Cash Management System are held at the Bank, which is designated as an authorized depository by the U.S. Trustee under the U.S. Trustee Guidelines and is insured by the FDIC.

141.     Further, in connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted between a Debtor and another Debtor giving rise to Intercompany Transactions, there may be intercompany balances owing by a Debtor to another Debtor. The Debtors have historically recorded all Intercompany Transactions and related intercompany balances on their books and records, and the Debtors intend to account for all post-petition Intercompany Transactions in accordance with past practice.

142.     The Debtors record Intercompany Transactions as journal entry receivables and payables in the Debtors' accounting system. In the ordinary course of business, certain transactions related to the Debtors' revenue streams and the flow of funds among the Debtors are settled in cash. The Debtors closely track all fund transfers in their accounting system and, therefore, can ascertain, trace, and account for all Intercompany Transactions.

143.     These Intercompany Transactions reduce administrative costs and ensure the orderly and efficient operation of the Debtors' enterprise. Accordingly, the Debtors engaged in the Intercompany Transactions on a regular basis prepetition and believe such transactions are

common for enterprises like the Debtors.  Consistent with these prepetition practices, the Debtors will continue to maintain records of all Intercompany Transactions post-petition and reconcile them.

144.     In light of the state of the Debtors' ongoing operations, any further disruption on the Debtors' cash management procedures at this time will hamper the Debtors' efforts to preserve and enhance the value of their estates.  Altering the Cash Management System could disrupt payments to essential employees and vendors at a time when their support is most critical.  It is therefore critical that the Debtors be permitted to use their Cash Management System, in accordance with the cash management procedures they put in place prior to filing these Chapter 11 Cases.

145.     Accordingly, the Debtors believe, and I agree, that it is in the best interest of the Debtors, their estates, their creditors, and other parties-in-interest in these Chapter 11 Cases that the Court grant the relief requested in the Cash Management Motion.

### H. *DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE THEIR WORKERS' COMPENSATION PROGRAMS AND THEIR LIABILITY, PROPERTY AND OTHER INSURANCE PROGRAMS AND (B) PAY CERTAIN OBLIGATIONS IN RESPECT THEREOF, AND (II) AUTHORIZING THE DEBTORS' FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS* (the "<u>Insurance Motion</u>")

146.     Pursuant to the Insurance Motion, the Debtors request interim and final orders allowing the Debtors to (a) continue their Insurance Programs on an uninterrupted basis in accordance with the practices and procedures in effect prior to the Petition Date, and to renew their Insurance Programs or obtain replacement coverage as needed in the ordinary course of business without further Court approval, and (b) pay, in their sole discretion, all undisputed premiums, claims, deductibles, administrative fees, broker fees and other obligations relating to the Insurance

Programs that were or are due and payable, whether relating to the period prior to or following the Petition Date.

147.    As of the Petition Date, the Debtors believe that they have paid all outstanding prepetition Insurance Obligations, but will owe up to $34,057 per month (excluding Worker's Compensation Premiums and directors' and officers' liability insurance) and up to $1,120 per month in Worker's Compensation Premiums in ordinary course payments post-petition under the Insurance Obligations, all of which is owed directly to the Insurance Carriers.  The Debtors estimate that the Insurance Obligations will decrease post-petition.

148.    In connection with the operation of their businesses, the Debtors maintain the Insurance Programs through the Insurance Carriers whom the debtors pay directly. The Insurance Programs provide the Debtors with insurance coverage for liabilities relating to, among other things, general liability, workers' compensation, directors' and officers' liability (including excess liability), errors and omissions, commercial property liability, and various other property-related liability and general liabilities.  The Insurance Programs also include any new or similar policies entered into by the Debtors due to expiration or otherwise.  Continuation of the Insurance Programs is essential to the operation of the Debtors' businesses and is necessary to protect the Debtors from catastrophic liability.

149.    The Debtors are required to pay premiums under the Insurance Programs based upon rates established by the applicable Insurance Carrier.  For the current policy periods of the Insurance Programs, the annual premiums for the Insurance Programs totaled approximately $2.5 million in the aggregate.  The Debtors pay premiums in full, directly to the Insurance Carriers at the commencement of the respective policies or on a prorated basis.

150.    In addition to annual premiums, the Debtors may be required to pay various deductibles and retentions for claims asserted under certain Insurance Programs. As of the Petition Date, the Debtors believe that they have paid all monthly charges and retrospective premium adjustments that have been billed by the Insurance Carriers for all periods through the Petition Date.

151.    Some of the Insurance Programs will expire or mature following the Petition Date and the Debtors may be required to pay premiums in connection with the renewal of such Insurance Programs. If the Debtors cease making payments on the Policies, the Insurance Companies may not allow the Debtors to renew these Policies at the current rates in the future. Though the Debtors do not believe that they need Court approval to amend, extend or renew the Insurance Programs in the ordinary course of business or pay any associated premiums in connection with such amendment, extension or renewal, they seek the authority to do so out of an abundance of caution.

152.    The Debtors are required to maintain Workers' Compensation Program in each state in which they have employees, in order to cover claims arising from or related to such employment. Under the Workers' Compensation Program, the Debtors are insured through Travelers for statutory liabilities with $1,000,000 per occurrence coverage. As of the Petition Date, the Debtors believe that they have paid all Workers' Compensation Premiums for all periods through the Petition Date.

153.    The Debtors paid an annual premium of $33,571.00 with respect to the Workers' Compensation Program for the policy period March 31, 2022, through March 31, 2023. The Debtors estimate that post-petition, the Debtors' Workers' Compensation Premiums will decrease to approximately $1,120 per month. Although the Debtors do not believe that they need Court approval for any further amendment, extension or renewal of the Workers' Compensation Program

in the ordinary course of business or to pay any associated premiums in connection with such amendment, extension or renewal, they seek the authority to do so out of an abundance of caution.

154.     In connection with the Insurance Programs, the Debtors employ the services of Baldwin Risk Partners, LLC as their Insurance Broker to assist them with the procurement, placement and negotiation of their Insurance Programs.  The Insurance Broker assists the Debtors in obtaining comprehensive insurance coverage for the Debtors' operations in the most cost-effective manner possible and enables the Debtors to obtain policies on advantageous terms and at competitive rates.

155.     The Insurance Broker charges Brokerage Fees, which are typically paid by the applicable Insurance Carrier.  As of the Petition Date, the Debtors do not believe that they owe any prepetition Brokerage Fees.  However, fees or commissions (or both) may become due to the Insurance Brokers in connection with policy renewals.  Although the Debtors do not believe that they need Court approval to pay Brokerage Fees that may become due in the ordinary course, they seek the authority to do so out of an abundance of caution.

156.     Accordingly, the Debtors believe, and I agree, that it is in the best interest of the Debtors, their estates, their creditors, and other parties-in-interest in these Chapter 11 Cases that the Court grant the relief requested in the Insurance Motion.

I.  ***DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 362 & 105(a) FOR ENTRY OF INTERIM AND FINAL ORDERS ESTABLISHING NOTIFICATION AND HEARING PROCEDURES AND APPROVING RESTRICTIONS ON CERTAIN TRANSFERS OF INTERESTS IN THE DEBTORS' ESTATES* (the "<u>Motion to Restrict</u>")***

157.     Pursuant to the Motion to Restrict, the Debtors request interim and final orders establishing and implementing restrictions and notification requirements regarding the Tax Ownership and certain transfers of the Stock in FNHC.

158.    The Debtors file a consolidated U.S. income tax return.  The Debtors have certain Tax Attributes for U.S. federal income tax purposes, which are expected to include approximately $178 million in estimated, consolidated NOLs by the end of the Debtors' 2022 taxable year.  The Tax Attributes may be valuable assets.

159.    Absent any intervening limitations and depending upon future operating results and the consummation of taxable asset dispositions by the Debtors, the Tax Attributes could substantially reduce the Debtors' U.S. federal income tax liability, including during the pendency of the Chapter 11 Cases.  The Tax Attributes are available to offset any income realized through the taxable year that includes the effective date of a chapter 11 plan, and potentially thereafter.  The Tax Attributes could translate into future tax savings over time and the availability of these tax savings may prove crucial to the financial health of the reorganized Debtors.

160.    The Debtors need the ability to enforce the stay to preclude certain transfers and to monitor and possibly object to other changes in the ownership of Stock.  Specifically, trading of Stock could adversely affect the Debtors' future ability to utilize the Tax Attributes if too many 5 percent or greater blocks of equity securities are created through purchases, sales, or issuances, or too many shares are added to or sold from such blocks, such that, together with the previous trading by 5 percent shareholders during the preceding three-year period, a section 382 Ownership Change is triggered prior to the consummation of a confirmed chapter 11 plan.

161.    The Debtors' ability to use the Tax Attributes to reduce future tax liability is subject to certain statutory limitations.  Sections 382 and 383 of the Tax Code limit a corporation's use of its tax attributes to offset future income or tax after that corporation has undergone an "Ownership Change" within the meaning of section 382 of the Tax Code.

162.     It is expected that the Debtors will undergo an Ownership Change for purposes of section 382 upon emergence from chapter 11.  In that event, the Debtors may seek to avail themselves of the special relief afforded by section 382(l)(5) of the Tax Code for changes in ownership under a confirmed chapter 11 plan.

163.     However, if the relief requested in the Motion to Restrict is not granted, there is a significant risk that, as a result of pre-consummation trading, this special relief would not be available to the Debtors and the use of the Debtors' Tax Attributes could be permanently impaired.

164.     Even if the Debtors are ultimately unable to satisfy the requirements of section 382(l)(5) or determine that it is more advantageous to elect not to accept its benefits, it is still in the best interest of the Debtors and their estates to restrict Stock trading that could result in a change of ownership of the Debtors before the confirmation of a chapter 11 plan.

165.     In order for the Debtors to qualify for the favorable valuation rule of section 382(l)(6) of the Tax Code, an Ownership Change must occur pursuant to the consummation of a chapter 11 plan.

166.     The Debtors believe that they have significant Tax Attributes that would be adversely affected (and could be effectively eliminated) by an Ownership Change during the pendency of these Chapter 11 Cases.  If such an Ownership Change occurs, the valuation for determining the annual amount of useable Tax Attributes would be at or close to zero, which may effectively eliminate the availability of such Tax Attributes.

167.     It is therefore in the best interests of the Debtors and their stakeholders to restrict trading that could result in an Ownership Change *before* the effective date of a chapter 11 plan or applicable bankruptcy court order.

168.     Accordingly, the Debtors request that the Court approve the following procedures to protect the Debtors' ability to use the Tax Attributes during the pendency of these Chapter 11 Cases and potentially thereafter.

169.     **PROPOSED PROCEDURES AND RESTRICTIONS**.  The Debtors seek to implement the following procedures and restrictions:

a.     <u>Notice of Substantial Equityholder Status</u>.  Any Substantial Equity Holder, meaning any Person who is or becomes a Tax Owner as of the Petition Date of at least 840,522 shares of Stock, which represents approximately 4.75 percent of the issued and outstanding Stock must, on or before the later of:  (i) 15 days after the Court's entry of an order approving these Procedures or (ii) 10 days after that Person becomes a Substantial Equityholder, serve on the Debtors, the attorneys for the Debtors, and the attorneys for the Creditors' Committee (if appointed) the Substantial Equityholder Notice containing the Tax Ownership information requested by the Debtors.

b.     <u>Restrictions and Procedures for Trading in Stock</u>.  Any Person that, after the Petition Date,

      i.   is not a Substantial Equityholder and wishes to purchase or otherwise acquire Tax Ownership of an amount of Stock that would cause the Person to become a Substantial Equityholder;

     ii.   is a Substantial Equityholder and wishes to purchase or otherwise acquire Tax Ownership of any additional Stock; or

   iii.   is a Substantial Equityholder and wishes to sell or otherwise dispose of Tax Ownership of any Stock,

must, prior to the consummation of any such transaction, file with the Court (at the holder's election, in a redacted form that does not include such holder's taxpayer identification number and the aggregate number of shares of Stock that such holder beneficially owns), and serve on the Debtors, the attorneys for the Debtors, and the attorneys for the Creditors' Committee (if

42

appointed) the Proposed Stock Transaction Notice.  The Debtors shall consult with counsel to the Creditors' Committee (if appointed) prior to responding to any Proposed Stock Transaction Notice. If written approval of the proposed transaction is filed with the Court by the Debtors within 15 calendar days following the receipt of a Proposed Stock Transaction Notice, then the transaction may proceed.  If written approval of the proposed transaction is not filed by the Debtors with the Court within such period, then the transaction may not be consummated unless approved by a final and non-appealable order of the Court.

   c. <u>Confidentiality</u>.  The Debtors, their counsel, and counsel to the Creditors' Committee (if appointed) shall keep all information provided in all notices strictly confidential and shall not disclose the contents thereof to any person (including any member of any Creditors' Committee (when appointed)), except (i) to the extent necessary to respond to a petition or objection filed with the Court, (ii) to the extent otherwise required by law, or (iii) to the extent that the information contained therein is already public; *provided, however,* that the Debtors may disclose the contents thereof to their professional financial advisers, who shall keep all such notices strictly confidential and shall not disclose the contents thereof to any other person subject to further Court order.  To the extent confidential information is necessary to respond to a petition or objection filed with the Court, such confidential information shall be filed under seal or in redacted form.

   d. <u>Sanctions for Noncompliance</u>.  Acquisitions and dispositions of Tax Ownership of Stock in violation of the restrictions and procedures set the Motion to Restrict shall be void *ab initio*, and the sanction for violating the terms of the Motion to Restrict shall be reversal of the noncompliant transaction or such other (or additional) measures as the Court may consider appropriate.

e.      <u>Discretionary Waiver by Debtors</u>.  The Debtors, with the consent of the Creditors' Committee (if appointed) or pursuant to an order of the Court, may waive any sanctions, remedies, or notification procedures imposed in the Motion to Restrict; *provided, however,* that any such waiver shall be filed with the Court.

f.      <u>Notice Procedures</u>.  Within three business days of the entry of the interim order approving the Motion to Restrict, the Debtors shall (i) submit a publication notice of the entry of the interim order approving the Motion to Restrict for posting within the New York Times; (ii) post such notice together with a copy of the interim order approving the Motion to Restrict on the Debtors' case information website (https://cases.stretto.com/FedNat); and (iii) serve a notice of the entry of the interim order approving the Motion to Restrict on (1) the Office of the United States Trustee for the Southern District of Florida; (2) any identified equity holder of FedNat Holding Company.; (3) those parties listed on the list of creditors holding the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis), as identified in their chapter 11 petitions; (4) the Internal Revenue Service; and (6) the Office of the United States Attorney for the Southern District of Florida.  Upon receipt of such notice, counsel to the Creditors' Committee (if appointed) shall send such notice to their respective committee members.

170.      Upon receipt of such notice of interim order approving the Motion to Restrict, any Agent of a beneficial holder of the Stock will be required, within five (5) business days of receipt of such notice and on at least a quarterly basis thereafter, to send the notice of interim order approving the Motion to Restrict to all beneficial holders of the Stock on whose behalf such Agent holds the Stock.  To the extent such beneficial holder is also an Agent, such Agent must, in turn, promptly provide the notice of interim order approving the Motion to Restrict to any holder for whose account such holder holds the Stock, and so on down the chain of ownership.

171.     Accordingly, the Debtors believe, and I agree, that it is in the best interest of the Debtors, their estates, their creditors, and other parties-in-interest in these Chapter 11 Cases that the Court grant the relief requested in the Motion to Restrict.

### V.     CONCLUSION

J.  For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Bankruptcy Court grants the relief requested in each of the First Day Motions and respectfully request the Bankruptcy Court to do so.


*[Signature on next page]*

Pursuant to 11 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true to the best of my information, knowledge, and belief.

Executed on December 11, 2022

_/s/ Katie S. Goodman_
Katie S. Goodman
Chief Restructuring Officer
FedNat Holding Company