UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| FEDNAT HOLDING COMPANY, *et al.*,[1] | Case No.: 22-19451-PDR |
| Debtors. | (Jointly Administered) |

_____/

**MOTION OF MONARCH NATIONAL INSURANCE COMPANY
AND HP MANAGING AGENCY, LLC FOR APPOINTMENT OF
AN EXAMINER PURSUANT TO SECTION 1104(c) OF THE BANKRUPTCY CODE**

Monarch National Insurance Company ("Monarch") and HP Managing Agency, LLC ("HPMA" and, together with Monarch, the "Movants"), creditors and parties in interest in the above-captioned chapter 11 cases (each a "Case" and collectively, the "Cases"), hereby respectfully submit this motion for entry of the proposed order attached as Exhibit A (the "Proposed Order") appointing an examiner to conduct an expedited investigation and to report to the Court regarding (i) certain recent postpetition events indicating a possible absence of fiduciary oversight with respect to one or more of the Debtors and such individual Debtors' distinct creditor bodies; (ii) whether, in light of such recent events, the Debtors' professionals are disinterested as to all of the Debtors and whether such professionals have provided sufficient disinterestedness disclosures to the Court; (iii) whether any of the Debtors' estates hold actionable claims and causes of action against any of their professionals, officers, or directors on account of such recent and possibly ongoing activity; and (iv) a recommended path forward for the cost-effective and value-maximizing liquidation of each distinct Debtor for the benefit of its unique creditor body.

---

[1] The Debtors in these Chapter 11 Cases are FedNat Holding Company ("FNHC"); FedNat Underwriters, Inc. ("FNU"); ClaimCor, LLC ("ClaimCor"); Century Risk Insurance Services, Inc. ("CRIS"); and Insure-Link, Inc ("Insure-Link"). The Debtors' headquarters are located at 14050 N.W. 14th Street, Suite 180, Sunrise, Florida.

Movants respectfully submit that appointment of an examiner is mandatory in the case of Debtor FNHC (the public parent company which owns 100% of each of the other four Debtors) pursuant to section 1104(c)(2) of title 11 of the United States Code (the "Bankruptcy Code") as FNHC's total fixed and liquidated unsecured debts exceed $5 million.  In addition, Movants respectfully submit that appointment of an examiner is warranted in each individual Debtor's Case pursuant to section 1104(c)(1) of the Bankruptcy Code as serving the interests of each Debtor's creditors due to postpetition irregularity and conflicts of interest impacting the management of each Debtor's estate.

In support of this Motion, Movants respectfully represent as follows:

## PRELIMINARY STATEMENT[2]

At the April 6 hearing in these Cases on the Debtors' first request for an extension of exclusivity, and in response to Movants' Limited Objection, a discussion ensued regarding the "big picture" of these Cases and their possible paths forward.  In the context of that discussion, the Court acknowledged the validity and logic of professional fee allocation concerns raised by Movants, and observed that because each Debtor is a liquidating debtor, because at least some of the Debtors' estates appear straightforward with virtually no assets other than cash and no employees, and because FNU and CRIS may be solvent and the bulk of Movants' claims are against those entities, that perhaps one liquidation outcome for at least some of these Debtors may be something other than the "joint plan" that the Debtors and Committee have indicated an intention to file.  In the context of the same discussion, the Court emphasized the need for estate professionals – who have billed fees of nearly $3.8 million since the Petition Date without any allocation of amounts to correspond to services provided to any specific Debtor – to maintain

---

[2] Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed below.

allocations because it is unknown how any one of the Debtors' Cases will conclude (or if any particular Debtor will have sufficient cash to pay fees properly allocable to that given Debtor).

In concluding, the Court aptly noted that there may be unknown agendas involved in these Cases.  Based upon certain events that occurred on the heels of the April 6 hearing and up until very recently, Movants respectfully submit that the Court's intuition was correct, and that unknown agendas are potentially driving behavior that is contrary to the fiduciary obligations of, and the fiduciary duties owed to, each individual liquidating Debtor.

Indeed, merely <u>one week</u> after the April 6 hearing, the Debtors <u>moved more than $5 million of cash from potentially solvent FNU to certain other Debtors</u> and have provided virtually no documents to support the Debtors' rationale for doing so, as discussed in detail in this Motion.  It cannot seriously be questioned that given the nature and specificity of the discussion before the Court on April 6, had the Debtors wished to be transparent and above-board regarding their actions since then, the Debtors would have first disclosed their intention to completely re-order their cash balances and intercompany balances while moving a substantial portion of FNU's cash, and would have requested Court approval to consummate these significant multi-Debtor transactions.  The timing of the Debtors' actions and their subsequent refusal to provide documentary support speaks volumes.  In and of itself, the sequence of events since April 6 and the Debtors' silence demonstrates the immediate need for a responsible, seasoned, and respected examiner to investigate the Debtors' recent conduct and transactions, and report to the Court before any "joint plan" process (and attendant increased fee burn) begins.

Movants recognize the gravity of this Motion and do not bring it lightly, but cannot stand by while the Debtors' professionals appear to play a shell game with each individual Debtor's cash, manipulate accounting for the benefit of certain Debtors and for undisclosed motives, and

generally act in the manner that has unfolded since April 6. For the reasons discussed below, Movants respectfully request that the Court appoint an examiner to conduct an expedited forty-five (45) day investigation for the purpose of deciphering what actually is driving the Debtors' recent disturbing behavior, whether each Debtor is being represented by disinterested professionals, whether any Debtor is being preferred to the detriment of another Debtor, whether any Debtor may hold claims or causes of action against any of its professionals, board members, or officers, and to recommend a value-maximizing and cost-effective path forward for each individual Debtor's liquidation.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction and venue over this Motion under 28 U.S.C. §§ 157, 1334, 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## BACKGROUND

A.      **The Chapter 11 Cases – General Background**

2.      On December 12, 2022 (the "Petition Date"), each Debtor filed a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida (the "Court"). The Cases have been consolidated for procedural purposes only.

3.      On the Petition Date, the Debtors submitted the *Declaration of Katie S. Goodman, Chief Restructuring Officer of FedNat Holding Company, in Support of Debtors' Chapter 11 Petitions and First Day Motions* [ECF No. 14] (the "First-Day Declaration").

4.      On December 22, 2022, the Debtors filed an application seeking to retain Nelson Mullins Riley & Scarborough ("NMRS") as bankruptcy counsel for each of the five Debtor entities pursuant to section 327(a) of the Bankruptcy Code, and in support attached the declaration of Shane G. Ramsey [ECF No. 72, Ex. B] (the "Ramsey Declaration"). The Ramsey Declaration

provides the following one-paragraph disclosure with respect to NMRS' prepetition relationship with the Debtors:

> The Firm has represented the Debtors since at least 2008, providing general corporate advice, assisting the Debtors in capital raises, debt offerings, and equity offerings, assisting the Debtors with trademark disputes, assisting the Debtors in its acquisition of the Maison Companies (as that term is defined in the First Day Declaration), representing the Debtors in the Monarch Transaction (as that term is defined in the First Day Declaration), and representing the Debtors from employee claims, shareholder demands, and enforcing non-compete provisions.

See Ramsey Declaration, ¶ 10 (emphasis added).  The Ramsey Declaration states that NMRS currently represents GGG Partners, LLC ("GGG") in certain matters unrelated to the Cases but provides no information regarding such matters.  Id., ¶ 14(ii).  The NMRS application was uncontested, and on January 26, 2023, the Court entered an order approving it.  [ECF No. 137].

5.      On December 12, 2022, the Debtors filed an application pursuant to section 363(b) of the Bankruptcy Code seeking authority to retain GGG as financial and restructuring advisor [ECF No. 8] (the "GGG Application"), and in support attached the Declaration of Katie S. Goodman (the "Goodman Declaration").  While the GGG Application and the Goodman Declaration state that Ms. Goodman is to serve as CRO of "the Debtors," and that Richard Gaudet of GGG is to serve as Chief Financial Officer of "the Debtors," and refers to an engagement letter among GGG and "the Debtors," the executed engagement letter attached to the GGG Application is between GGG and FNHC only.  The GGG Application was uncontested, and on December 20, 2022, the Court entered an order approving it [ECF No. 59].  GGG is not required to file fee applications in the Cases.

6.      On January 9, 2023, the Office of the United States Trustee for the Southern District of Florida appointed a five-member official committee of unsecured creditors in the Cases [ECF No. 92] (the "Committee").

7.      On January 5, 2023, each Debtor filed with the Court its schedules of assets and liabilities and statement of financial affairs (collectively, as subsequently amended by certain Debtors, the "Schedules/SOFAS").  The Schedules/SOFAS make no reference to any claim or contingent claim that any Debtor believed it held as of the Petition Date with respect to either of the Movants or any of their principals or affiliates.   The Schedules/SOFAS provide no disclosure regarding intercompany amounts owed by one Debtor to another Debtor as of the Petition Date.

8.      During the Cases, the Debtors sold their operating businesses pursuant to sale transactions approved by the Court.   [ECF Nos. 211 and 285]. These transactions yielded $1,776,750 from the sale of Insure-Link and $2,000,000 from the sale of select FNU assets, accumulating a total sum of $3,776,750 (almost the same amount as the approximately $3.8 million of estate professional fees billed in the Cases so far).  Accordingly, the Debtors no longer have any business operations and are liquidating entities.  No plan of liquidation has been filed by any Debtor, and the Court has extended each Debtor's exclusive filing and solicitation periods through July 9, 2023, and September 7, 2023, respectively.

**B.  Debtors' Early Public Posture Towards Movants in These Cases**

9.      The First-Day Declaration focuses on one primary precipitating factor as the impetus for the filing of these Cases, namely, the placement of the Debtors' most significant customer – its wholly-owned subsidiary FedNat Insurance Company – into receivership, and the attendant negative ramifications to the Debtors' revenue and business.  As stated at the outset of the First-Day Declaration:

> A significant component of the Debtors' business model is therefore dependent on the annual renewal of policies written by its insurance carrier clients, whereupon the Debtors earn commissions and additional revenue for providing services in connection with those policies.

> Until late September 2022, FNHC's most significant customer was its wholly owned subsidiary FedNat Insurance Company ("FNIC"), which was an insurance carrier and an "admitted" company and licensed to write homeowners insurance in all or some of the states of Florida, Louisiana, Texas, South Carolina, Alabama, Georgia, and Mississippi . . . .

> On September 27, 2022, [FNIC was placed in receivership] . . . .

> As a result [of FNIC being placed in receivership], FNHC has experienced a significant loss of revenue, an impairment of its cash flow, and an immediate deterioration in its enterprise value. Thus, after entry of the Receivership Order, FNHC's principal business consists of its servicing functions for [Monarch] under the MGA Agreement.

See First-Day Declaration, ¶¶ 16-20.

10.     The First-Day Declaration also discusses, in a positive light, the Debtors' prepetition recapitalization transaction involving Movants:

> In order to recapitalize, on May 23, 2022, FNHC entered into an agreement with HPCM, whereby, among other things, HPCM and its affiliates invested $15 million into [Monarch], which caused HPCM to become the majority owner of [Monarch] (the "Monarch Transaction"). FNIC also invested $10 million into [Monarch] for the remainder of [Monarch's] common stock and retains two seats on [Monarch's] board of directors . . .

> Thus, through the Monarch Transaction, FNHC materially exited non-Florida markets. In doing so, the Debtors reduced their exposure to catastrophe losses and earnings volatility and re-focused on Florida operations, where the Debtors' approved rates have increased substantially, and where recent legislative actions have begun to improve the claims litigation environment . . . .

Id., ¶¶ 47-49.

11.     The First-Day Declaration makes no reference of any intention by the Debtors to use these Cases for the purpose of pursuing litigation against Movants.

C. **The Debtors' Posture Towards Movants Changes**

12.     In the months following the Petition Date, the Debtors' posture towards Movants began to change dramatically from that presented to the Court at the outset.  During this period, FNU repeatedly attempted (often successfully, despite protest by Monarch) to extract substantial payments from Monarch under the threat of immediate and irreparable harm to Monarch's business and the interests of its nearly 60,000 policyholders.  In response to such actions, on March 15, 2023, Movants filed an adversary proceeding against FNU [Adv. Case No. 23-01053-PDR] (the "Adversary Proceeding"), which is pending.

13.     Five days later, on March 20, 2023, the Debtors filed an expedited motion pursuant to section 1121(d) of the Bankruptcy Code seeking a ninety-day extension of the Debtors' initial exclusive filing and solicitation periods through July 9 and September 7, 2023, respectively [ECF No. 250] (the "Exclusivity Motion"), in which the Debtors, among other things, stated their intention of filing a "joint plan" together with the Committee.[3]  On April 4, 2023, Movants filed a Limited Objection to the Exclusivity Motion [ECF No. 294] (the "Exclusivity Objection"), asserting, among other things, that the Cases are not complex as none of the Debtors are operating, and all of the Debtors other than FNHC have a simple balance sheet and an estate that can be expeditiously liquidated for the benefit of its respective creditor body.  In addition, Movants filed a Limited Objection to the first interim fee applications of the Committee's professionals (the "Committee Fee Applications") that also were heard on April 6 [ECF No. 293] (the "Fee Objection" and, together with the Exclusivity Objection, the "Limited Objections"), in which Movants objected to "the absence of any allocation of such fees to individual Debtors and to any

---

[3] Exclusivity Motion, ¶ 8.

proposed allocation of such fees that would place an undue burden on FNU as compared with other Debtors" (Fee Objection, ¶ 12), and noted Monarch's claims against each Debtor as follows:

| Debtor | Amount |
|---|---|
| FNU | $1,626,541.21 (plus additional amounts) |
| CRIS | $2,705,754 (plus additional amounts) |
| FNHC | $232,766 |
| ClaimCor | $232,766 |

14.    In the Exclusivity Objection, Movants noted each of the Debtors' most recent disclosures on the docket regarding each individual Debtor's cash, intercompany receivables and payables, employees (if any), tax refunds, and other assets (if any).  In particular, Movants noted the following disclosures by the Debtors from their February 2023 monthly operating reports regarding cash and employees:

| Debtor / Docket | Cash | Employees |
|---|---|---|
| FNU [ECF No. 247] | $8.951 MM | 27 |
| Insure-Link [ECF No. 254] | $2.982 MM | 0 |
| CRIS [ECF No. 249] | $579,695.50 | 0 |
| ClaimCor [ECF No. 248] | $170,879.31 | 0 |

15.    On April 6, 2023, the Court held a hearing on the Exclusivity Motion, the Committee Fee Applications, and the Limited Objections.[4]  On the record of the April 6 hearing, the following, among other things, took place:

- The Court asked Debtors' counsel whether each individual Debtor's estate is truly complex from the perspective of accomplishing a liquidation;

---

[4] A copy of the April 6, 2023 hearing transcript is attached as Exhibit B (the "April 6 Tr.").

- The Court inquired of Debtors' counsel as to whether the Debtors intend to seek substantive consolidation of their respective estates;

- The Court observed that at the level of entities below Debtor FNHC, each Debtor "is an entity that has cash that if not comingled with other – or sub conned with other entities, has no future, if you will, in terms of what needs to take place from a sales perspective or liquidation perspective," and questioned whether a possible conversion of these simpler cases to Chapter 7 may, potentially, be appropriate, noting the simplicity of what may be left in those entities;[5]

- The Court asked Debtors' counsel whether the Debtors have described potential claims against Monarch anywhere (to which the Debtors responded as to a belief that contingent claims against Monarch were listed in the Schedules/SOFAS; as noted above, no such claims are referenced anywhere in the Schedules/SOFAS);

- The Court, in granting the ninety-day extension of exclusivity, noted:

  > There are some conflicting claims.  <u>There might be an agenda here. You know, part of the problem with being on this side of the bench is you don't know all of the agendas, underlying agendas that may be going on, but I know they're potentially out there.  So, that is of concern to me as well.</u>[6]

- The Court, in approving the Committee Fee Applications, noted the logic of Movants' concern regarding time entry allocations, and stated:

  > Okay.  All right, and again, that's a choice you all are making, to keep your fees billed to the entities as you deem appropriate at this time.  I assume you've thought that through, and if you haven't, you're going to now think it through to make sure you at least preserve the ability to break them out, if that's what is ultimately required . . .

  > In terms of payment now, though, what do you do with the 80 percent?  How is that – where is that money coming from, and how is it being allocated . . .  <u>It's an arguably "now issue," except that transfers could be made between estates postpetition to allocate that as well if there is money in those estates, so it depends on that, but it could be cured if it was improper at this point</u> …

  > I'm not going to dictate where the monies are paid from, just everyone recognize that there will be a day of, I hate to use that term,

---

[5] April 6 Tr., 49, 4-16; 53, 10-54, 24.

[6] April 6 Tr., 55, 5-10 (emphasis added).

*(continued on next page)*

reckoning, but a day of allocation that will have to occur down the
road, okay?[7]

16.     One week later, on April 13, 2023, the Court held a hearing on and approved the

interim fee applications of the Debtors' professionals, where Debtors' counsel noted a "great

working relationship" with Debtors' constituents including Movants.[8]

**D.  The Debtors Commence Scorched Earth Litigation Against Movants and**
     **Engage in Concerning Postpetition Transactions Tainted by Conflicts of Interest**

17.     One month after these hearings, on May 15, 2023, NMRS on behalf of Debtors

FNHC, FNU, and ClaimCor (collectively, the "AP Debtors"), filed their *Counterclaims and Third-*

*Party Complaint* in the Adversary Proceeding (the "Third-Party Complaint").  In stark contrast to

the narrative regarding the precipitating factors for these Cases set forth in the First Day

Declaration, the AP Debtors by their 103-page responsive pleading attempt to create a new

scapegoat for their business failures, now contending that their "once profitable insurance business

… became the victim of a scheme to seize control of what little value remained in the companies,"

hurling a barrage of outrageous and hyperbolic accusations at Movants and, in particular, Movants'

principal Steve Hale.[9]

18.     On May 18, 2023, the Debtors filed with the Court their operating reports for the

month of April 2023 (collectively, the "April MORs").[10]

---

[7] April 6 Tr., 67 - 69 (emphasis added).

[8] A copy of the April 13, 2023 hearing transcript is attached as Exhibit C (the "April 13 Tr.").  April 13 Tr., 7, 18.

[9] Accordingly, NMRS, on behalf of the AP Debtors, is now representing the AP Debtors in challenging the very same transactions that NMRS negotiated extensively on behalf of the AP Debtors and advised the AP Debtors to enter into, and as to which the Debtors received at least one fairness opinion from a separate professional firm, Piper Sandler, working in collaboration with NMRS on such transactions at the time.  The Ramsey Declaration (which has not been supplemented since the filing of the NMRS Application) provides no disclosure or explanation of any intention by NMRS, in the Cases, to represent FNHC in seeking to avoid these same transactions, nor any explanation of NMRS' disinterestedness as to each Debtor notwithstanding NMRS having advised the Debtors on the Monarch Transaction prepetition.

[10] A copy of each Debtor's April 2023 operating report is attached as Exhibit D [ECF Nos. 344 (FNHC); ECF No. 345 (ClaimCor); ECF No. 346 (CRIS); ECF No. 347 (FNU); ECF No. 348 (Insure-Link)].

19.     Upon review of the April MORs, <u>Movants learned that on April 13 – the very same day that the Debtors were before the Court touting the "great working relationship" among the parties, and one week after the above-referenced discussion at the April 6 Hearing – the Debtors unilaterally transferred $5.1 million of cash (in the aggregate) from Debtor FNU to Debtors FNHC and ClaimCor</u>, and re-set all of the Debtors' intercompany balances (collectively, the "<u>Postpetition Intercompany Transactions</u>"), under the guise of a unilaterally determined "postpetition adjustment" of "improper prepetition allocation of income tax expense."[11]

20.     After analyzing the April MORs, one week later on May 25, 2023, Movants' counsel sent a letter to Debtors' counsel requesting an explanation of each such payment and adjustment and, in particular, requested a prompt explanation of "the recent and severe degradation of the cash at FNU."[12]  The May 25 Letter also requested that the Debtors produce supporting documentation for each such intercompany transaction including, without limitation, any contracts or invoices supporting the intercompany cash transfers or evidencing the incurrence of intercompany obligations and the dates any obligations were incurred or services provided.

21.     On June 2, 2023, Debtors' counsel sent a letter to Movants' counsel in response to the May 25 Letter (the "<u>June 2 Letter</u>").[13]  Debtors' June 2 response failed to include any documents (other than an excerpt of one Excel spreadsheet, discussed below) supporting any of the Postpetition Intercompany Transactions highlighted in Movants' letter.  Further, the June 2 Letter revealed the Debtors' unilateral and previously undisclosed and unapproved shifting of millions of dollars of value – including cash, intercompany receivables, and tax refund rights –

---

[11] <u>See</u> FNHC April 2023 operating report, 1-2 ("Comments to Debtors' Monthly Operating Reports for the Period Ended April 30, 2023").

[12] A copy of the May 25 Letter is attached as <u>Exhibit E</u>.

[13] A copy of the June 2 Letter is attached as <u>Exhibit F</u>.

from previously cash-rich FNU (where, as stated at the April 6 Hearing, most of Movants' claims

are asserted), to FNHC.  The June 2 Letter is rife with assertions that show, at best, inconsistencies

and irregularities in the management of each Debtor's postpetition estate, and at worst, an absence

or disregard of the separate fiduciary duty owed by each Debtor's professionals to each individual

Debtor's estate and distinct creditor body.  Solely by way of example, the June 2 Letter:

- asserts that until March 3, 2023, all of the Debtors' payroll was paid by FNU – contradicting the Debtors' representations in the First-Day Declaration, First-Day Wages Motion,[14] Schedules/SOFAS, and Monthly Payroll Tax Reports[15] filed with the Court since the Petition Date – and providing no explanation of the rationale for the non-operating Debtors who no longer have an ordinary course of business to change their historical payroll practice postpetition, much less to do so without Court approval;

- asserts that the Debtors performed a so-called "True Up" of intercompany cash balances on April 13, 2023 and indicates that the Debtors intend to continue to perform such "True Ups" (without prior disclosure or Court approval), despite the fact that the First-Day Declaration and the Debtors' First-Day Cash Management Motion[16] makes no reference to engaging in any such "true-up" practice while the Debtors were operating, and despite the fact that the Debtors are no longer operating and therefore are in an entirely different posture as to intercompany cash management than they were at the Petition Date;

- provides, with respect to the "True Up," only a narrative response and an excel spreadsheet purporting to detail certain transfers (and no other supporting documents).  In the purported detail, the Debtors, in four journal entries labeled "True Up," move $6,009,402.25 of cash between Debtors: (i) $3,365,944.50 moved to FNHC (of which $2,566,549.86 came from FNU, $588,031.46 came from Insure-Link, and $211,363.18 came from ClaimCor), and (ii) an additional  $2,643,457.75 moved from FNU to ClaimCor.  The transfers from potentially solvent FNU total in excess of $5 million, as noted above;

- asserts that Monarch regularly makes payments to FNU for "payments that are actually due to ClaimCor or FNHC," despite the fact that Monarch has no contract with ClaimCor or FNHC and, as a regulated insurance carrier, Monarch must have a Form D approved by

---

[14] Motion for Entry of Interim and Final Orders (a) Authorizing Debtors to Pay (i) All Pre-Petition Employee Obligations, (ii) Pre-Petition Withholding Obligations, and (iii) Post-Petition Employee Obligations in the Ordinary Course, and (b) Authorizing Banks to Honor Related Transfers [ECF No. 10] (the "First-Day Wages Motion").

[15] ECF Nos. 51, 52, 53, 54, and 55.  The Debtors' monthly payroll tax reports reflect that only FNHC has paid or accrued payroll taxes since the Petition Date.

[16] Motion for Entry of Interim and Final Order (a) Authorizing the Debtors to Continue to (i) Maintain Their Cash Management System, (ii) Honor Certain Prepetition and Postpetition Obligations Related Thereto, (iii) Use Existing Business Forms, and (iv) Peform Intercompany Transactions, and (b) Granting Related Relief Filed by Debtor FedNat Holding Company [ECF No. 11] (the "First-Day Cash Management Motion").

the Florida Office of Insurance Regulation ("OIR") to enter into any contract to flow funds to outside parties that are not policyholders. Monarch has properly paid FNU per the MGA agreement and its contractual obligations as approved by the OIR; and

- reveals that the Debtors purport to have restated all of their prepetition intercompany balances on the basis of the Debtors' sudden determination that their historic intercompany tax allocations were "recorded incorrectly, which resulted in adjustments to opening balances to properly account for income tax payments over the period of 2014 through 2021" – a determination which, if correct, would mean that the Debtors, presumably under GGG's analysis and direction, now disavow seven years of statutory audits performed by the Debtors' auditor for that period, Ernst & Young. In terms of magnitude, such unilateral adjustments exceed $79 million with respect to the period of time covered by the Ernst & Young audits.

22.    In light of the content of the Debtors' June 2 letter and the Debtors' failure to provide any documentary support in response to Movants' May 25 Letter, on June 7, 2023, Movants filed with the Court and served upon the Debtors a *Notice of Bankruptcy Rule 2004 Examination Duces Tecum of the Debtors* [ECF No. 371], directing the Debtors to produce documents in the interest of obtaining transparency regarding each Debtor's postpetition conduct with respect to these matters.

23.    On June 15 and June 16, 2023, the estate professionals filed new interim fee applications [ECF Nos. 373, 377, 378, and 379], seeking $1,089,341 in total compensation for the period March 1 through May 31, 2023,[17] and reporting the following cash balances in the estates:

---

[17] For completeness, a chart reflecting the cumulative amount of fees requested by, and paid by the Debtors to, each estate professional to date is attached as Exhibit G.

*(continued on next page)*

| Debtor | Cash balance reported as of 4/16 Hearing | Cash balance subsequently reported in fee applications filed 6/15, 6/16 |
|---|---|---|
| FNHC | $452,668[18] | $2.331 MM |
| FNU | $8.951 MM | $5.492 MM |
| Insure-Link | $2.982 MM | $2.144 MM |
| CRIS | $579,695.50 | $535,621 |
| ClaimCor | $170,879.31 | $2.723 MM |

## RELIEF REQUESTED

24.     Movants respectfully submit that it is critical to the integrity of these chapter 11 Cases that the Court be able to assess, with full and complete information, the nature and extent of the irregularities surrounding the postpetition administration of each Debtor's estate, and matters related thereto, before these non-operating estates burn a substantial amount of <u>additional</u> cash by embarking upon what may be – when full clarity is provided through a prompt examination – a fatally flawed plan process that should not proceed.  An examiner's investigation is necessary to ensure that each Debtor's assets are being protected by a disinterested fiduciary before the plan process moves forward and limited estate resources are further depleted if not exhausted.

25.     Accordingly, Movants respectfully request the appointment of an independent examiner pursuant to section 1104(c) of the Bankruptcy Code to investigate and report on:

- The reasons and motivations for the Postpetition Intercompany Transactions – including, but not limited to, the transfer by Debtor FNU on April 13, 2023, of more than $5 million of cash to Debtors FNHC and ClaimCor – effectuated without Court oversight, let alone approval;

- The nature and sufficiency of the process and the substantive analysis undertaken by each individual Debtor in considering whether to enter into each of the Postpetition Intercompany Transactions;

---

[18] For the reporting period ended April 30, 2023, as per the FNHC monthly operating report filed on May 18, 2023 [ECF No. 344].

- Whether any of the Postpetition Intercompany Transactions constitute a breach of the fiduciary duty owed by the applicable transacting Debtor to its respective creditor constituency and, if so, the extent or potential extent of the harm or damage to such creditor constituency as a result of such breach;

- Whether, in advising the applicable Debtors to enter into the Postpetition Intercompany Transactions, any of the estate professionals breached its fiduciary duty to one or more Debtors, whether any of the Debtors hold actionable claims or causes of action against any such professionals on account thereof, and, if so, the nature and extent of any such claims or causes of action;

- Whether, in approving the applicable Debtors' entry into the Postpetition Intercompany Transactions, any of such Debtors' directors or officers breached any fiduciary duty owed to such Debtor, whether any such Debtor holds actionable claims or causes of action against such directors or officers or account thereof, and, if so, the nature and extent of any such claims or causes of action;

- Whether the Postpetition Intercompany Transactions are likely avoidable pursuant to section 549(a)(1)(B) of the Bankruptcy Code as unauthorized postpetition transactions effectuated by a chapter 11 debtor without court approval, and should be unwound;

- Whether, in light of the role of the estate professionals in simultaneously advising multiple Debtors to effectuate the Postpetition Intercompany Transactions and overseeing such Debtors' consummation of the Postpetition Intercompany Transactions, any of the estate professionals hold or represent an undisclosed interest adverse to any Debtor's estate and therefore is not "disinterested" as to such Debtor, and whether, if so, any remedy such as disgorgement or disqualification is warranted;

- Whether, in light of the role of the estate professionals in seeking on behalf of certain Debtors, through the currently pending Adversary Proceeding, to avoid certain prepetition agreements with the Movants that the very same estate professionals drafted, negotiated, and advised the Debtors upon and advised the Debtors to enter into prepetition, such estate professionals have undisclosed conflicts of interest or hold or represent an interest adverse to any Debtor's estate, which may include conflicts preventing them from being adverse to the Debtors' current or former directors or officers, and, if so, the appropriate remedy; and

- A recommended path forward for each Debtor consistent with each Debtor's fiduciary obligations to its creditor constituency including, but not limited to, a recommendation as to whether any Debtor requires separate counsel to ensure disinterestedness going forward.

### E. Appointment of an Examiner in FNHC's Case Is Mandatory Under Section 1104(c)(2) of the Bankruptcy Code

26.     Appointment of an examiner is mandatory in FNHC's Case under the plain language of section 1104(c) of the Bankruptcy Code, which provides:

> (c) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and hearing, the Court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if –

> (1) such appointment is in the best interest of creditors, any equity security holders, and other interests of the estate; or
> (2) the debtor's fixed, liquidated, unsecured debts, other than debts or goods, services, or taxes or owing to an insider, exceed $5,000,000.

11 U.S.C. 1104(c).

27.     Courts consistently recognize the mandatory nature of the appointment of an examiner under section 1104(c)(2).  As the U.S. Court of Appeals for the Sixth Circuit stated in *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, section 1104(c)(2) of the Bankruptcy Code "plainly means that the bankruptcy court 'shall' order the appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5 million, if [a party in interest] requests one." 898 F.2d 498, 500-01 (6th Cir. 1990).  Relying on the imperative nature of the word 'shall' and the contrast between the subsections of section 1104(c), the Court of Appeals in *Revco* held that the appointment of an examiner is mandatory under section 1104(c)(2). *Id.*

28.     "Section 1104(c)(2) does not leave any room for the court to exercise discretion about whether an examiner should be appointed, as long as the $5,000,000 threshold is met and a motion for appointment of an examiner is made by a party in interest." 7 COLLIER ON

BANKRUPTCY ¶ 1104.03(2)(b) at 1104- 38 (15th ed. rev. 2004); *Loral Stockholders Protective Comm. V. Loral Space Communs., Ltd. (In re Loral Space & Comuns., Ltd.)*, 2004 U.S. Dist. LEXIS 25681, *15-16 (S.D.N.Y. Dec. 23, 2004) (reversing bankruptcy court's denial of motion to appoint examiner holding "that the Bankruptcy Court had no discretion to deny appointment of an examiner where, as here, the $5,000,000 debt threshold is met and shareholders of a public company have moved for appointment of an examiner").

29.     The elements of section 1104(c)(2) are satisfied here. The Court has not appointed a trustee, no plan has been filed by any Debtor (much less confirmed), and FNHC's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, are well in excess of $5 million. See FNHC Petition [ECF No. 1]; Consolidated List of Top 30 Unsecured Creditors [ECF No. 3]; FNHC Amended Schedule [ECF No. 15]; First-Day Declaration, ¶ 35 (noting, as of the Petition Date, "approximately $100 million in principal outstanding under the [unsecured] Senior Notes" and "approximately $21 million in principal outstanding under the [unsecured] Convertible Notes"); First-Day Declaration, ¶ 39 ("As of the Petition Date, the Debtors have unsecured debt in the combined approximate amount of $171 million.")

30.     Accordingly, appointment of an examiner is mandatory in the FNHC case under section 1104(c)(2).

**F.  Appointment of an Examiner Is Warranted Under Section 1104(c)(1)**

31.     Not only is appointment of an examiner mandatory in FNHC's case under section 1104(c)(2) of the Bankruptcy Code, but the Debtors' conduct as described herein makes clear that appointment of an examiner is in the "interests of the debtors' creditors" as defined in section 1104(c)(1).

32.     Section 1104(c) is designed to address allegations of "fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor." 11 U.S.C. § 1104(c). The appointment of an examiner is in the interests of creditors where "such appointment allows for a thorough, independent, and expeditious examination to be made into serious allegations." *In re JNL Funding Corp.*, No. 10-73724, 2010 WL 3448221, at *3 (Bankr. E.D.N.Y. Aug. 26, 2010) (appointing examiner under section 1104(c)(1) to investigate allegations of debtor's prepetition misconduct); see also *In re Mirant Corp.*, 314 B.R. 555, 560 (Bankr. N.D. Tex. 2004) (appointing and clarifying examiner's role, noting that "intercompany transactions and intercompany debt offer the potential for conflict"). "One of the functions of an examiner is to investigate potential causes of action to the estate." *In re Gilman Servs., Inc.*, 46 B.R. 322, 328 (Bankr. D. Mass. 1985).

33.     To establish that an examiner is in the "interests of creditors", a party seeking appointment of an examiner under section 1104(c)(1) must put forth "credible evidence" to substantiate its allegations of the debtor's fraud or misconduct. *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 856 (Bankr. S.D.N.Y. 1994). However, the moving party does not need to establish the merits of its case upon a motion to appoint an examiner. See *In re 1243 20th St. Inc.*, 6 B.R. 683, 686 (Bankr. D.D.C. 1980). That, of course, is the purpose of the examiner's investigation.

34.     Movants respectfully submit that appointment of an examiner is in the interests of creditors of each individual Debtor's estate and creditor body.

35.     First, the Postpetition Intercompany Transactions – both in their substance and their timing – call out for an independent assessment of what has occurred, why, and at which entity or entities' direction and whether and to what extent (if any) each transacting Debtor's intents were

taken into account.  This case involves multiple non-operational Debtor entities on both sides of intercompany transfers advised by one set of advisors.  From a  timing perspective, these transfers occurred within days of the Court's inquiries at the April 6 Hearing, when the Debtors were <u>already on notice of Movants' concern and the Court's concern</u> regarding the allocation of professional fees to separate Debtor estates and the specific Debtor's responsibility for actual payment of fees being a "now issue," when the specter of potentially converting some of these entities cases to Chapter 7 was raised, and on the same day that the Debtors professed a "great working relationship with both the Committee and [Movants]."

36.    Second, given what appears to be an underlying agenda to drain the assets of potentially solvent Debtors (i.e., FNU and CRIS) for the benefit of other Debtors (or professionals) through the Postpetition Intercompany Transactions, additional oversight and clarity over and concerning such actions is warranted.  Despite Movants' efforts to obtain information concerning these Postpetition Intercompany Transactions and other intercompany rebalances or "true-ups," the Debtors' conduct remains shrouded in a black box with no information on why these transfers and "true-ups" are necessary or appropriate.  Movants simply seek, and the Bankruptcy Code requires, transparency and clarity on the Debtors' postpetition conduct, and appointing an examiner to investigate and report on these issues is the perfect solution to either uncover potential malfeasance or assuage Movants' (and likely the Court's) concern about potential malfeasance.

37.    Finally, as previously explained to the Court, these are non-operating, liquidating Debtors with primarily fixed assets and separate creditor groups.  To protect the interests of all creditor groups with respect to each Debtor and each Debtors' assets, the movement of assets among Debtors must be transparent and with appropriate oversight.  As recognized by the court in *In re Mako, Inc.*:

> [A]n Examiner will keep his finger on the pulse of the business to
> protect the interests of the creditors while investigating that the
> alleged improprieties do not warrant the appointment of a Trustee.
> This should calm the creditors' fears that any further deterioration
> of corporate assets will occur while limiting the drain on the estate.

102 B.R. 809, 814 (E.D. Okl. 1988).

38.    Accordingly, for all the reasons stated above, the appointment of an independent

examiner to investigate the above-described irregularities in the postpetition management of the

Debtors' liquidating estates is warranted pursuant to section 1104(c)(1) of the Bankruptcy Code.

**G.  Examiner's Scope, Budget, and Timing**

39.    Under section 1106(b) of the Bankruptcy Code, a court-appointed examiner shall

perform the duties set forth in sections 1106(a)(3) and 1106(a)(4), which provide that an examiner

shall:

> (3) except to the extent that the court orders otherwise,
> investigate the acts, conduct, assets, liabilities, and financial
> condition of the debtor, the operations of the debtor's
> business and the desirability of the continuance of such
> business, and any other matter relevant to the case or to the
> formulation of a plan;
> (4) as soon as practicable –
> (A) file a statement of any investigation conducted under
> paragraph (3) of this subsection, including any fact
> ascertained pertaining to fraud, dishonesty,
> incompetence, misconduct, mismanagement, or
> irregularity in the management of the affairs of the
> debtor, or to a cause of action available to the estate; and
> (B) transmit a copy or a summary of any such statement to
> any creditors' committee or equity security holders'
> committee, to any indenture trustee, and to such other
> entity as the court designates.

11 U.S.C. § 1106(a).

40.    The proposed scope of the examiner's investigation as set forth in paragraph 25

above (the "Investigation") is well within the purview of an examiner's role, as set forth in the

plain language of section 1106 of the Bankruptcy Code. See *Gilman Servs.*, 46 B.R. at 327 (the primary function of an examiner is to "investigate the debtor's actions, financial condition, as is appropriate under the particular circumstances of the case including any allegations of fraud, dishonesty or gross mismanagement of the debtor by current or former management"). Movants respectfully submit that it is wholly realistic for an independent examiner to quickly become up to speed, conduct a forty-five (45) day Investigation, and submit a report to the Court on the matters included with the proposed scope (the "Report"). Movants further submit that an examiner's budget for this purpose should be in an amount determined by the Court to be reasonable, and likely would be a fraction of what the estate professionals would continue to charge these liquidating estates were the status quo to continue unchanged.

*[Remainder of Page Intentionally Left Blank]*

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, Movants respectfully request that the Court enter the Proposed Order (i) appointing an examiner for the purpose of conducting the Investigation and submitting the Report; and (ii) granting Movants such other and further relief as is just.

Dated: June 20, 2023                                                  Respectfully submitted,

                                                                     */s/ Harris J. Koroglu*

James R. Langdon                                   Harris J. Koroglu
Stephen E. Gruendel                                Florida Bar No. 32597
Mark A. Nebrig                                     Peter H. Levitt
Sarah A. Sheridan                                  Florida Bar No. 650978
**MOORE & VAN ALLEN PLLC[19]**                     **SHUTTS & BOWEN LLP**
100 North Tryon Street, Suite 4700                 200 South Biscayne Blvd., Suite 4100
Charlotte, NC 28202                                Miami, FL 33131
Telephone: (704) 331-1000                          Telephone: (305) 347-7314
E-mail: jimlangdon@mvalaw.com                      E-mail: hkoroglu@shutts.com
         stevegruendel@mvalaw.com                          plevitt@shutts.com
         marknebrig@mvalaw.com
         sarahsheridan@mvalaw.com

*Counsel for Monarch National Insurance Company
and HP Managing Agency, LLC*

---

[19] The undersigned attorneys are appearing pro hac vice in this matter pursuant to the following Orders Admitting Attorney *Pro Hac Vice*: (i) Stephen E. Gruendel [ECF No. 286]; (ii) James R. Langdon [ECF No. 287]; (iii) Mark A. Nebrig [ECF No. 288]; and (iv) Sarah A. Sheridan [ECF No. 289].

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the forgoing was served on June 20, 2023 on all parties listed on the below Service List via the Court's Notice of Electronic Filing and/or First Class U.S. Mail, postage prepaid.

/s/ *Harris J. Koroglu*
Harris J. Koroglu

## SERVICE LIST

**Electronic Mail Notice List**

- **Scott Andron**    sandron@broward.org, swulfekuhle@broward.org
- **Paul A Avron**    pavron@bergersingerman.com, efile@bergersingerman.com;efile@ecf.inforuptcy.com;mmorgan@bergersingerman.com
- **Jeffrey P. Bast**    jbast@bastamron.com, jdepina@bastamron.com;kjones@bastamron.com;jmiranda@bastamron.com;mdesvergunat@bastamron.com
- **Hayley G Harrison**    hgerson@bastamron.com, jmiranda@bastamron.com;kjones@bastamron.com;mdesvergunat@bastamron.com;mdesvergunat@bastamron.com
- **Alan C Hochheiser**    ahochheiser@mauricewutscher.com, 8371350420@filings.docketbird.com
- **Leigh Hoffman**    lhoffman@lippes.com
- **Harris J. Koroglu**    hkoroglu@shutts.com, mcabo@shutts.com;bvelapoldi@shutts.com
- **Philip J Landau**    phil@landau.law, plandau@ecf.courtdrive.com;diane@landau.law;dlocascio@ecf.courtdrive.com
- **David B Marks**    brett.marks@akerman.com, charlene.cerda@akerman.com
- **Office of the US Trustee**    USTPRegion21.MM.ECF@usdoj.gov
- **Thomas A Pitta**    tpitta@emmetmarvin.com, pdelrio@emmetmarvin.com
- **Shane G Ramsey**    shane.ramsey@nelsonmullins.com, shane.ramsey@nelsonmullins.com;linnea.hann@nelsonmullins.com;keith.poston@nelsonmullins.com;john.baxter@nelsonmullins.com;jennifer.murray@nelsonmullins.com;frank.knowlton@nelsonmullins.com
- **Brian G Rich**    brich@bergersingerman.com, efile@bergersingerman.com;efile@ecf.courtdrive.com;zmorton@bergersingerman.com
- **Bradley S Shraiberg**    bss@slp.law, dwoodall@slp.law;dwoodall@ecf.courtdrive.com;pmouton@slp.law
- **Jesus M Suarez**    jsuarez@continentalpllc.com, dsanchez@continentalpllc.com
- **Jeffrey W Warren**    jwarren@bushross.com, bankruptcy.eservice@bushross.com
- **J. Steven Wilkes**    steven.wilkes@usdoj.gov

**Manual Notice List**

**John T Baxter**
150 Fourth Avenue North #1100
Nashville, TN 37219

**Todd Burney**
c/o Lead Adjusting, L.L.C.
21 NE 22nd St Apt 1227
Miami, FL 33137

**Steven W. Golden**
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017-2024

**Katie S Goodman**
c/o GGG Partners LLC
3155 Roswell Road NW #120
Atlanta, GA 30305

**Leigh A Hoffman**
54 State Street # 1001
Albamy, NY 12207

**Rick Kelley**
c/o TierPoint L.L.C
12444 Powerscourt Dr #450
St Louis, MO 63131

**Paul J. Labov**
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017-2024

**Kathryn B McGlynn**
909 Third Ave
Floor 30
New York, NY 10022

**Juan Mira**
c/o Sawgrass Commerce Center
225 NE Mizner Blvd #501
Boca Raton, FL 33432

**Ian T Peck**
2323 Victory Ave #700
Dallas, TX 75219

**Brandon K Poston**
Post Office Box 11070
Columbia, SC 29201

**Dennis Roenlein**
c/o The Bank of New York Mellon
601 Travis St, 16th Floor
New York, NY 10286

**Bradford J Sandler, Esq.**
Pachulski Stang Ziehl & Jones
919 North Market Street, 17th Floor
Wilmington, DE 19801

**Les Schleinger**
c/o Links Insurance Services
2901 Clint Moor Rd #317
Boca Raton, FL 33496

**Stretto**
410 Exchange, Ste. 100
Irvine, CA 92602

**Thomas Zavala**
2323 Victory Ave #700
Dallas, TX 75219